Slip Op. 14-142

UNITED STATES COURT OF INTERNATIONAL TRADE

—————————————————————— :
                                                    :
XIPING OPECK FOOD CO., LTD.,                         :
                                                    :
          Plaintiff,                                :
                                                    :
          v.                                        :
                                                    :
UNITED STATES,                                       :      Before: Richard K. Eaton, Senior Judge
                                                    :
          Defendant,                                :      Court No. 12-00112
                                                    :
          and                                       :
                                                    :
CRAWFISH PROCESSORS ALLIANCE,                        :      **PUBLIC VERSION**
                                                    :
          Defendant-Intervenor.                     :
—————————————————————— :

## OPINION and ORDER

[United States Department of Commerce's Final Results are remanded.]

Dated: December 11, 2014

*Yingchao Xiao*, Lee & Xiao, of San Marino, CA, argued for plaintiff.

*Antonia R. Soares*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant. With her on the brief were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director. Of counsel on the brief was *Rebecca Cantu*, Attorney, International Office of Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, D.C.

*John C. Steinberger*, Adduci, Mastriani & Schaumberg, LLP of Washington, D.C., argued for defendant-intervenor. With him on the brief was *Will E. Leonard*.

EATON, Senior Judge: This matter is before the court on plaintiff Xiping Opeck

Food Co., Ltd.'s ("Xiping" or "plaintiff") motion for judgment on the agency record pursuant to

USCIT Rule 56.2. By its motion, Xiping, an exporter of freshwater crawfish tail meat from the

People's Republic of China ("PRC"), challenges the United States Department of Commerce's

("Commerce" or the "Department") Final Results in the 2009–2010 administrative review of the

antidumping duty order on crawfish tail meat from the PRC.  Freshwater Crawfish Tail Meat

From the PRC, 77 Fed. Reg. 21,529, 21,529 (Dep't of Commerce Apr. 10, 2012) (final results of

antidumping duty administrative review and rescission of review in part), and accompanying

Issues and Decision Memorandum ("Issues & Dec. Mem.") (collectively, "Final Results").  In

the Final Results, Commerce determined a rate of 70.12 percent for plaintiff's crawfish tail meat

based on the application of adverse facts available ("AFA").  Issues & Dec. Mem. at 4.

Defendant United States ("defendant") opposes plaintiff's motion and asks that

Commerce's Final Results be sustained.  *See* Def.'s Resp. in Opp'n to Pl.'s Rule 56.2 Mot. for J.

upon the Agency R. (ECF Dkt. No. 34) ("Def.'s Br.").  Defendant-intervenor, the Crawfish

Processors Alliance ("Crawfish Processors Alliance" or "defendant-intervenor"), a trade

association composed of members that manufacture, produce, or sell freshwater crawfish tail

meat in the United States, joins in opposition to plaintiff's motion.  *See* Br. of Def.-int., the

Crawfish Processors Alliance, in Opp'n to Pl.'s Rule 56.2 Mot. for J. upon the Agency R. (ECF

Dkt. No. 37); Consent Mot. of the Crawfish Processors Alliance to Intervene as of Right as Def.-

int. ¶ 6 (ECF Dkt. No. 14).  For the reasons set forth below, Commerce's Final Results are

remanded.

## BACKGROUND

On September 15, 1997, the Department issued an antidumping duty order on crawfish tail meat from the PRC.[1]  Freshwater Crawfish Tail Meat From the PRC, 62 Fed. Reg. 48,218 (Dep't of Commerce, Sept. 15, 1997) (notice of amendment to final determination of sales at less than fair value and antidumping duty order) (the "Order").  On October 28, 2010, following the receipt of a petition filed by the Crawfish Processors Alliance, the Department initiated an administrative review of the Order for the period of review ("POR") of September 1, 2009 through August 31, 2010.  *See* Initiation of Antidumping and Countervailing Duty Administrative Reviews, 75 Fed. Reg. 66,349, 66,350 (Dep't of Commerce Oct. 28, 2010).  After initially selecting Xiping and Yancheng Hi-King Agriculture Developing Co., Ltd. ("Hi-King") for individual examination, the Department rescinded the review with respect to Hi-King, leaving Xiping as the sole mandatory respondent.[2]  *See* Freshwater Crawfish Tail Meat From the PRC, 76 Fed. Reg. 10,879, 10,879–80 (Dep't of Commerce Feb. 28, 2011) (rescission of antidumping duty administrative review in part).

---

[1]      The merchandise subject to the antidumping duty order is described as freshwater crawfish tail meat, in all its forms (whether washed or with fat on, whether purged or un-purged), grades, and sizes; whether frozen, fresh, or chilled; and regardless of how it is packed, preserved, or prepared.  Excluded from the scope of the order are live crawfish and other whole crawfish, whether boiled, frozen, fresh, or chilled.  Also excluded are saltwater crawfish of any type, and parts thereof.
Final Results, 77 Fed. Reg. at 21,529–30.

[2]      The review of Hi-King was rescinded by Commerce pursuant to 19 C.F.R. § 351.213(d)(1), after the Crawfish Processors Alliance sent the Department a notice of withdrawal of its request for a review of the company.  Freshwater Crawfish Tail Meat From the PRC, 76 Fed. Reg. 10,879, 10,880 (Dep't of Commerce Feb. 28, 2011) (rescission of antidumping duty administrative review in part).

During the course of the review, the Crawfish Processors Alliance submitted a letter to

the Department alleging that Xiping was involved in middleman dumping[3] during the POR.

Letter from John C. Steinberger, Counsel for the Crawfish Processors Alliance, to The

Honorable Gary Locke, Secretary of Commerce, U.S. Department of Commerce at 2, CD 27

(June 6, 2011), ECF Dkt. No. 21 ("Middleman Dumping Allegation Letter").  In support of its

middleman dumping allegation, defendant-intervenor referred to evidence of Xiping's sales to

the importer of record, GB Imports & Exports, Inc. ("GBIE"), and of GBIE's subsequent sales to

its customer, Company A,[4] a foreign entity.[5]  *See* Middleman Dumping Allegation Letter at 2, 3,

6.  Defendant-intervenor claimed that the sales between Xiping and GBIE, and the sales between

GBIE and Company A, were conducted at artificially inflated prices.  *See* Middleman Dumping

Allegation Letter at 6.  Further, according to defendant-intervenor, Company A resold Xiping's

merchandise to U.S. wholesalers at prices below Company A's artificially inflated acquisition

cost.  *See* Middleman Dumping Allegation Letter at 6.  Thus, defendant-intervenor maintained

that Company A sold Xiping's merchandise to U.S. wholesalers at dumped prices.

Following the receipt of comments concerning the middleman dumping allegation,

Commerce determined that, although a middleman dumping analysis was not warranted, "an

---

[3]        Middleman dumping, in a nonmarket economy context, is normally thought of as
below-cost sales into the United States by a reseller of a respondent producer's merchandise,
rather than by the respondent producer itself.  *See* S. REP. NO. 96-249, at 94 (1979), *reprinted in*
1979 U.S.C.C.A.N. 381, 480.  As shall be seen, although the Department used information from
defendant-intervenor's Middleman Dumping Allegation Letter, it did not pursue a middleman
dumping investigation.

[4]        [[                                        ]] identity is being withheld because Xiping's
customer, GBIE, claimed business-proprietary treatment for this information.  Issues & Dec.
Mem. at 2 n.2.  All references to this company hereinafter will be to "Company A."

[5]        Company A is a [[              ]] entity.

inquiry into [Company A's] selling practices" was.  Mem. from Laurie Parkhill, Office Director,

for Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty

Operations at 6, CD 12 (Sept. 30, 2011), ECF Dkt. No. 21 ("Transactions Mem.").  In reaching

this conclusion, Commerce stated "that [Company A] plays a central, but as yet unexplained,

role in the U.S. pricing associated with entries of crawfish tail meat subject to this review" and

that Company A "appears to be an exporter that has made, or has participated in making, the first

sales to unaffiliated U.S. purchasers."[6]  Transactions Mem. at 15–16.

On October 7, 2011, after "receiv[ing] a complete response to the antidumping

questionnaire from Xiping," Commerce published its Preliminary Results, calculating a

weighted-average dumping margin of zero percent for Xiping.  Preliminary Results Freshwater

Crawfish Tail Meat From the PRC, 76 Fed. Reg. 62,349, 62,349, 62,351, 62,355 (Dep't of

Commerce Oct. 7, 2011) (of antidumping duty administrative review and intent to rescind review

in part) ("Preliminary Results").  Thus, Commerce preliminarily determined that Xiping's sales

---

[6]     The Department made this finding based on the following observations: (1) "GBIE's purchases from Xiping . . . were simultaneous with its re-sales to" Company A; (2) "GBIE resold crawfish tail meat to a third country (*i.e.*, [[          ]])"; (3) "GBIE transferred the title to goods only days after importation"; and (4) "GBIE admits . . . that [Company A] agreed to purchase crawfish tail meat from GBIE prior to the date of importation into the United States."  Transactions Mem. at 14–15.  Based on the foregoing, Commerce reasoned that, "[g]iven the [[                ]] from the time of GBIE's importation and entry of such goods into the United States and the timing of [Company A's] taking title to goods, it [was] highly likely that [Company A] agreed to resell goods back to the United States prior to the time of importation."  Transactions Mem. at 15.  The Department explained further that "the totality of circumstances surrounding [Xiping's] U.S. sales to GBIE and GBIE's re-sales to [Company A] in [[          ]] call[ed] into question the commercial viability associated with the transactions between Xiping . . . and GBIE in the context of a dumping analysis."  Transactions Mem. at 15.

had not been made below normal value,[7] and therefore that its merchandise had not been

dumped.

Nonetheless, based on the observations in its Transactions Memorandum, Commerce sent

multiple nonmarket economy[8] questionnaires to Xiping and its importer, GBIE, which both

companies fully answered.  In addition, the Department twice sent Company A nonmarket

economy questionnaires seeking to learn whether it was an "entity properly subject to a dumping

inquiry as an exporter of subject merchandise and ultimately responsible for the pricing of entries

of crawfish tail meat into the United States."  *See* Mem. from Susan H. Kuhbach, Office

Director, for Paul Piquado, Assistant Secretary for Import Administration at 2, CD 20 (Feb. 13,

2012), ECF Dkt. No. 21 ("AFA Mem.").  Company A responded to both of Commerce's

requests with letters stating that it was not an exporter of crawfish tail meat because its purchases

and sales were made after the merchandise had entered the United States and, as a result,

---

[7]        "A dumping margin is the difference between the normal value . . . of
merchandise and the price for sale in the United States." *Qingdao Taifa Grp. Co. v. United
States*, 35 CIT __, __ n.1, 780 F. Supp. 2d 1342, 1345 n.1 (2011) (citing 19 U.S.C. §§
1673e(a)(1), 1677(35)).  In nonmarket economy "reviews, Commerce determines normal value
by using the 'best available information' from the surrogate country to value the factors of
production." *DuPont Teijin Films v. United States*, 37 CIT __, __, 896 F. Supp. 2d 1302, 1310
(2013) (quoting 19 U.S.C. § 1677b(c)(1)).  The "export price or constructed export price is the
price that the merchandise is sold for in the United States." *Qingdao*, 35 CIT at __ n.1, 780 F.
Supp. 2d at 1345 n.1 (citing 19 U.S.C. § 1677a(a)–(b)).

[8]        A nonmarket economy country is "any foreign country that [Commerce]
determines does not operate on market principles of cost or pricing structures, so that sales of
merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. §
1677(18)(A).  Because the Department considers the PRC "to be a nonmarket economy country,
Commerce generally considers information on sales in [the PRC] and financial information
obtained from Chinese producers to be unreliable for determining . . . the normal value of the
subject merchandise." *Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 481,
318 F. Supp. 2d 1339, 1341 (2004).  Thus, where, as here, the subject merchandise is exported
from the PRC, the Department is instructed by the statute to "determine the normal value of the
subject merchandise on the basis of the value of the factors of production utilized in producing
the merchandise . . . in a market economy country or countries." 19 U.S.C. § 1677b(c)(1).

Company A was not an "interested party" under the statute.  AFA Mem. at 2.  In other words, Company A insisted that, despite its status as a foreign company, its purchases and sales of the crawfish tail meat took place within the borders of the United States, and thus it neither produced nor exported Xiping's product, and therefore was not required to respond to the Department's nonmarket economy questionnaires.

Following the receipt of the questionnaire responses, the Department produced a Post-Preliminary Analysis Memorandum.  *See* AFA Mem.  In this memorandum, the Department found, based on Company A's lack of cooperation, that "the limited information provided by Xiping . . . c[ould not] serve as a reliable basis for reaching an accurate dumping determination with respect to Xiping."  AFA Mem. at 4 (citing 19 U.S.C. § 1677m(e)(3)).  Furthermore, Commerce determined that Company A was an exporter and "interested party by virtue of its involvement in the relevant U.S. sales and pricing of the entries under review" and that Company A's failure to cooperate with the review warranted use of an adverse inference[9] with respect to the facts used to determine an antidumping margin for Xiping.  *See* AFA Mem. at 5–6; 19 U.S.C. § 1677e(b).

Importantly, in reaching its conclusion, Commerce found (1) that Xiping and GBIE fully cooperated with the review, (2) no affiliation among any of Xiping, GBIE, Company A, or the U.S. wholesalers, and (3) no collusion among any of the participants in the transactions.  *See* AFA Mem. at 6; Transactions Mem. at 5–6, 12.

---

[9]      As will be discussed in greater detail below, as an adverse inference, the Department calculated Xiping's dumping margin using, as the export price, the lowest assumed price charged by Company A to its U.S. customers for the subject merchandise during the POR, and, as normal value, Company A's highest acquisition cost during the POR of the subject merchandise obtained from GBIE.  AFA Mem. at 7; Issues & Dec. Mem. at 4.

In the Final Results, Commerce confirmed its findings and determined a rate of 70.12

percent to Xiping's merchandise that had been calculated in the Post-Preliminary Analysis

Memorandum using AFA.  *See* Final Results, 77 Fed. Reg. at 21,531.


## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19

U.S.C. § 1516a(b)(1)(B)(i).


## DISCUSSION

### I.     THE CRAWFISH PROCESSORS ALLIANCE'S MIDDLEMAN DUMPING ALLEGATION

In its Middleman Dumping Allegation Letter, the Crawfish Processors Alliance described

a chain of transactions from Xiping to the U.S. wholesalers, and asked Commerce to initiate a

middleman dumping investigation of Xiping, GBIE, and Company A.  *See* Middleman Dumping

Allegation Letter at 2.  Defendant-intervenor claimed, in its submission, that Xiping's U.S. sales

were made consecutively through two middlemen: first to GBIE, which acted as the importer of

record, and second, to Company A, which purchased Xiping's product from GBIE.  Middleman

Dumping Allegation Letter at 6.  Defendant-intervenor further alleged that Company A then

resold Xiping's merchandise to U.S. wholesalers, which then sold the crawfish tail meat to

retailers in the United States.  Middleman Dumping Allegation Letter at 6.  To make its case,

defendant-intervenor claimed that indirect U.S. pricing data and direct cost data demonstrated

that a substantial portion of Company A's sales of Xiping's crawfish tail meat in the United

States were made at prices substantially below Company A's cost of acquisition.  Middleman

Dumping Allegation Letter at 13; Transactions Mem. at 3.

The manner by which defendant-intervenor constructed the acquisition costs and sales

prices on which it based its middleman dumping allegation requires some explanation.  First,

defendant-intervenor sought to ascertain a cost for the crawfish tail meat bought by Company A.

To establish this cost, the defendant-intervenor relied on invoices for eight sales of Xiping's

crawfish tail meat that GBIE sold to Company A during the POR.  Middleman Dumping

Allegation Letter at 7, 18.  Using these invoices, defendant-intervenor then calculated a

weighted-average acquisition cost of the merchandise for Company A.[10]  Middleman Dumping

Allegation Letter at 7.

Second, defendant-intervenor constructed an export price (U.S. sales price) based on the

prices offered by the U.S. wholesalers of the crawfish tail meat to their retailers.  *See* Middleman

Dumping Allegation Letter at 10.  Because defendant-intervenor was unable to determine

Company A's resale prices of the crawfish tail meat to the U.S. wholesalers directly, it "relied on

prices offered by four different U.S. wholesalers . . . of subject merchandise"[11] that appeared to

be "produced by Xiping[,] . . . as indirect evidence of the prices charged by" Company A, to

calculate a wholesale market price.[12]  Transactions Mem. at 3; Middleman Dumping Allegation

---

[10]     The Crawfish Processors Alliance calculated a weighted-average acquisition cost
of [[          ]] per kilogram during the POR.  Middleman Dumping Allegation Letter at 7.

[11]     The price offers were from Propax (Int'l) Inc., Fishline Seafoods Inc., Corrigan
Trading Corp., and Ocean Harvest Wholesale, Inc.  Middleman Dumping Allegation Letter at 10,
24.

[12]     Using a simple average of the price offers from the four U.S. wholesalers to
prospective retailers, the Crawfish Processors Alliance calculated a U.S. wholesale market price
of $11.28 per kilogram during the POR.  *See* Middleman Dumping Allegation Letter at 12, 22.
(footnote continued)

Letter at 10.  That is, defendant-intervenor reasoned that the wholesalers would necessarily have paid Company A no more than the price at which they were offering to sell the merchandise to their retailers.

Having constructed the amount that the wholesalers were charging their retailers, for what it believed was Xiping's crawfish tail meat, defendant-intervenor calculated a claimed dumping margin for Company A.[13]  *See* Middleman Dumping Allegation Letter at 12–13.  This calculation was made by subtracting the average of the U.S. wholesale price offers of the four wholesalers, from Company A's weighted average acquisition cost of Xiping's subject merchandise from GBIE.  Middleman Dumping Allegation Letter 10, 12–13.  Thus, defendant-intervenor used the claimed amount for which the U.S. wholesalers were offering to sell Xiping's crawfish tail meat to the U.S. retailers as Company A's export price (U.S. price), and then subtracted that amount from Company A's acquisition price, which was used as normal value.  As a result, defendant-intervenor maintained that Company A, as a middleman, was dumping Xiping's crawfish tail meat.

Although it could be asserted that the wholesalers' acquisition price from Company A would logically be less than the price they offered to their retailers, defendant-intervenor used a simple average of the offered prices as the price that the wholesalers paid Company A for the crawfish tail meat.  Thus, using the wholesalers' offering prices as the export price (U.S. price), and Company A's acquisition costs from GBIE as normal value, the Crawfish Processors

---

In its answers to Commerce's questionnaires, GBIE provided thirty-four invoices for sales of crawfish tail meat to Company A that demonstrated that it sold the merchandise to Company A at prices between [[        ]] per kilogram and [[        ]] per kilogram.  *See* AFA Mem. at 7, 10.

[13]        The Crawfish Processors Alliance calculated an average dumping margin for Company A of [[        ]] percent.  Middleman Dumping Allegation Letter at 12.

Alliance alleged that Company A was making a substantial portion of its sales of Xiping's

merchandise to U.S. wholesalers at prices significantly below its acquisition costs from GBIE.[14]

Notably, the Crawfish Processors Alliance relied on an affidavit from a competing U.S.

wholesaler[15] to identify the four U.S. wholesalers that it claimed bought Xiping's crawfish tail

meat from Company A.[16]  *See* Middleman Dumping Allegation Letter at 24.  In other words,

defendant-intervenor used an affidavit to demonstrate that Company A was selling Xiping's

crawfish tail meat to four named U.S. wholesalers.


## II.   COMMERCE'S DETERMINATIONS

As an initial matter, it is clear that once it had the Middleman Dumping Allegation Letter,

Commerce was reasonable in seeking more information about the chain of transactions by which

Xiping's crawfish tail meat was sold into the United States.  Indeed, it is difficult to see these

---

[14]      The Crawfish Processors Alliance alleged that Company A was selling Xiping's
crawfish tail meat, on average, [[      ]] percent below its acquisition cost from GBIE.  *See*
Middleman Dumping Allegation Letter at 12.

[15]      The affidavit was from [[
            ]], which sold subject merchandise supplied by [[          ]].  Middleman
Dumping Allegation Letter at 24.  U.S. Customs and Border Protection data demonstrated that
during the POR [[      ]] percent of entries of subject merchandise into the United States were
from two exporters, Xiping and [[            ]].  Transactions Mem. at 6.  Thus, if the product did
not belong to [[            ]], the Crawfish Processors Alliance reasoned that it must have been
Xiping's crawfish tail meat.  [[


                        ]].

[16]      [[     ]] of Xiping's U.S. sales during the POR were made to GBIE, and [[     ]]
of GBIE's sales during the POR were made to Company A.  Middleman Dumping Allegation
Letter at 11.  Thus, the Crawfish Processors Alliance claimed that, because "all of these U.S.
resellers were handling Xiping['s] . . . merchandise, and since [[


                                                                      ]].

Middleman Dumping Allegation Letter at 11.

transactions as anything other than an attempt to make it appear that Xiping's merchandise

entered the country based on invoices that did not accurately reflect the true relationship between

normal value and export price.  Here, the question is largely whether the Department determined

an antidumping duty rate for plaintiff's merchandise based on record evidence and based on the

law.

Although the Department declined to initiate a middleman dumping inquiry, it

nevertheless endeavored to determine "whether Company A and/or Xiping [was] the entity

properly subject to a dumping inquiry as an exporter of subject merchandise and ultimately

responsible for the pricing of entries of crawfish tail meat into the United States."  Issues & Dec.

Mem. at 2 (citing Preliminary Results, 76 Fed. Reg. at 62,350).  Commerce, thus, issued the

nonmarket economy questionnaires that resulted in Company A's assertion that it was not an

"interested party" because its purchases and sales of crawfish tail meat were made within the

territory of the United States.  Issues & Dec. Mem. at 2–3.

Notwithstanding this position, Commerce determined that Company A was an interested

party that had "significantly impeded the proceeding because it did not provide any of the

information which [the Department] determined to be critical and necessary for the completion

of an administrative review of the entries and sales made by Xiping."  Issues & Dec. Mem. at 3

(citing AFA Mem. at 3); 19 U.S.C. § 1677e(a)(2)(C).  Based on Company A's impeding of the

review by refusing to answer the questionnaires, Commerce determined that it lacked U.S. sales

and pricing information needed to calculate a margin for Xiping.  AFA Mem. at 5.  Thus,

Commerce "found it necessary," pursuant to 19 U.S.C. § 1677e(a),[17] to use "facts otherwise

available" to calculate the dumping margin for Xiping.  Issues & Dec. Mem. at 3.

Moreover, Commerce determined that Company A, as an interested party, "failed to

cooperate by not acting to the best of its ability to comply with a request for information by the

Department."  AFA Mem. at 5 ("This failure to provide the U.S. sales and pricing information,

which we determined to be relevant in the *Preliminary Results* in calculating a dumping margin

for Xiping . . . in this review, indicates a lack of cooperation on the part of [Company A] to

comply with our requests for information.").  As a result of this failure to cooperate by Company

A, the Department "found that an adverse inference [was] warranted in determining a dumping

margin for Xiping."  Issues & Dec. Mem. at 3–4, 12–13 (citing AFA Mem. at 5–6) ("While it is

Company A that has failed to cooperate by not acting to the best of its ability with the

Department's request for cooperation with respect to the appropriate U.S. sales price, the lack of

cooperation reasonably results in the application of an adverse inference applicable to the

calculation of the dumping margin for the sales and entries made by Xiping . . . with Company

A . . . in this review."); *see* 19 U.S.C. § 1677e(b).

Even though Xiping itself had fully cooperated in the review, the Department determined

that it was reasonable to apply AFA to the facts used to assign its "rate because the record

evidence establishes that Xiping . . . shipped all subject merchandise that Company A sold to the

United States" during the POR and based on Xiping's assumed knowledge of Company A's

---

[17]      The Department is directed to "use the facts otherwise available in reaching the
applicable determination" where "an interested party or any other person . . . significantly
impedes a proceeding."  19 U.S.C. § 1677e(a)(2)(C).

dumping of the merchandise.[18]  Issues & Dec. Mem. at 13.  As to assumed knowledge,

Commerce found that Xiping must have known of the below-acquisition-price sales of its

merchandise because it was "reasonable to assume that a company whose market share was such

that it 'determined' market prices would be well aware of the prices at which wholesalers were

offering its subject merchandise [to retailers], and would thus be aware that wholesalers' prices

were significantly lower than the selling price [to GBIE that] it reported to the Department."

Issues & Dec. Mem. at 13 (citing Transactions Mem. at 8–9).  Put another way, for Commerce,

because Xiping (1) knew how much GBIE paid for the crawfish tail meat, (2) "would have had

reason to know" that Company A was selling its merchandise, and (3) could be charged with

knowledge that the sales price offers by the U.S. wholesalers were below its sales price to GBIE,

AFA could be applied both to the U.S. sales price and to normal value when assigning a

dumping margin to Xiping.  *See* Issues & Dec. Mem. at 12–13.  Although Commerce claims that

Xiping had or should have had knowledge that its crawfish tail meat was being dumped in the

---

[18]     The Department reasoned that, because of Xiping's "admitted presence and knowledge of the market, it would have had reason to know that its shipments of subject merchandise were ultimately being sold at less than GBIE's buyer's acquisition cost to unaffiliated U.S. purchasers."  Issues & Dec. Mem. at 13.  For instance, Xiping "claim[ed] that its sales prices *determine* what the market prices are and that its dominance means that it in effect sets the prevailing prices of the market."  Issues & Dec. Mem. at 13 (citation omitted) (internal quotation marks omitted).  Indeed, Customs data indicated that [[     ]] percent of all entries of subject merchandise during the POR were from two exporters, Xiping and [[ ]].  Transactions Mem. at 6.  Commerce also found that Xiping's "prices increased drastically from the last POR and [[                                          ]]," and "at the same time, Xiping's sales quantity also increased drastically from the last POR."  Transactions Mem. at 6.  Specifically, "Xiping's prices increased by [[     ]] percent from the last POR and increased by [[   ]] percent more than an increase in its competitors' prices."  Transactions Mem. at 6.  In addition, "Xiping's sales quantity increased by [[      ]] percent from [the] last POR and increased by [[     ]] percent more than an increase in its competitors' sales quantity."  Transactions Mem. at 6.

United States by Company A, the Department does not explain the significance of this finding,

or why this claimed knowledge, on the part of Xiping, was material to its determination.

In order to determine a dumping margin for Xiping, Commerce used much of the method

employed by defendant-intervenor in its Middleman Dumping Allegation Letter to determine an

export price using facts available.[19]   In addition, however, relying on the findings above, the

Department applied AFA.  Thus, it "rel[ied] on record evidence for the *lowest prices* charged by

[Company A] in the Unite[d] States" to reach an export price.  AFA Mem. at 7 (emphasis

added); 19 U.S.C. § 1677e(c).  To find this lowest price, the Department calculated a simple

average for each size of crawfish tail meat, and then, as an adverse inference, selected the lowest

average price.  *See* Transactions Mem. at 8; AFA Mem. at 7.

Although Xiping had fully answered the Department's questionnaires, and despite having

calculated normal value based on its factors of production in the Preliminary Results, the

Department applied AFA to reach normal value for Xiping's merchandise.  Therefore, for

normal value, the Department used, as facts available, Company A's acquisition costs as reported

by GBIE.  "The acquisition costs represent GBIE's sales prices of Xiping['s] . . . product to

[Company A] throughout the POR."  AFA Mem. at 7.  Again, the Department applied AFA.

Rather than selecting a weighted average price paid by Company A for Xiping's merchandise

that it purchased from GBIE, the Department applied an adverse inference and "used [Company

A's] highest acquisition cost during the POR based on [the Department's] examination of all the

prices that GBIE invoiced for crawfish tail meat to" Company A.  AFA Mem. at 7.  After

---

[19]          As noted, defendant-intervenor used the offering prices of the U.S. wholesalers to
U.S. retailers to find an assumed amount that Company A charged the wholesalers.

subtracting this claimed export price (U.S. price) from the claimed normal value, the Department

derived a dumping rate of 70.12 percent for Xiping.  AFA Mem. at 7.


III.    APPLICATION OF AFA TO XIPING

Here, the primary question is whether Commerce is permitted, under 19 U.S.C. §

1677e(b), to draw adverse inferences with respect to the facts used to determine the cost of the

acquisition or production (normal value) and export price (U.S. sales price) of a cooperating

party's (i.e., Xiping) subject merchandise, based on the behavior of a non-cooperating,

unaffiliated entity (i.e., Company A).  In answering this question in the affirmative, the

Department made a number of findings.


A.  Company A as an "Interested Party"

First, Commerce found that Company A was an interested party under the antidumping

laws.  The statute, in relevant part, defines an "interested party" as "a foreign manufacturer,

producer, or *exporter*, or the United States importer, of subject merchandise."[20]  19 U.S.C. §

1677(9)(A) (emphasis added).  The statute and Commerce's regulations, however, are silent as to

the definition of the term "exporter."  Because there is no relevant definition of the term

"exporter," the court must determine whether Commerce's construction of the term is in

accordance with law.

When reviewing Commerce's construction of the trade statute, this Court is directed by

the two-step framework set forth by *Chevron*.  *Fine Furniture (Shanghai) Ltd. v. United States*,

---

[20]     "Subject merchandise" is defined as "the class or kind of merchandise that is
within the scope of an investigation, a review, a suspension agreement, an order[,] . . . or a
finding."  19 U.S.C. § 1677(25).

748 F.3d 1365, 1369 (Fed. Cir. 2014) (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)).  The first step requires a determination as to whether Congress's intent under the statute is clear.  *Chevron*, 467 U.S. at 842–43.  If clear, the court "must give effect to the unambiguously expressed intent of Congress.  If, however, the court determines Congress has not directly addressed the precise question at issue," i.e., "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* (footnotes omitted). Further, under *United States v. Mead*, Commerce's construction of a statute need not be found in a formal regulation adopted after notice-and-comment to receive deference.  *See United States v. Mead Corp.*, 533 U.S. 218, 230–31 (2001).  Thus, "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Id.* at 226–27.

Although undefined by statute or regulation, to "export" is ordinarily thought of as "to transport (merchandise) from one country to another in the course of trade."  BLACK'S LAW DICTIONARY 700 (10th ed. 2014).  Indeed, it is this activity that has traditionally been the focus of entities that have been found to be exporters under the antidumping laws.  *See, e.g.*, *Michaels Stores, Inc. v. United States*, 766 F.3d 1388, 1390–91 (Fed. Cir. 2014); *Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*, 753 F.3d 1227, 1229 (Fed. Cir. 2014); *Jacobi Carbons AB v. United States*, 38 CIT __, __ & n.1, 992 F. Supp. 2d 1360, 1362–63 & n.1 (2014). Thus, under its ordinary meaning, an exporter is not thought of as a company that takes title to the merchandise after the goods have already entered the United States and cleared Customs.

The statute itself provides only that an "interested party" is, *inter alia*, "a foreign

manufacturer, producer, or *exporter*, or the United States importer, of subject merchandise."  19

U.S.C. § 1677(9)(A) (emphasis added).  The statute provides no further explanation as to the

type of entity that qualifies as an exporter.  That is, it is unclear, based on the plain language of

the statute, that it was the intent of Congress to find, as an exporter under the unfair trade laws,

an entity that takes title to goods after importation into the United States.  Therefore, it is the

court's task to determine, under *Chevron*'s second step, whether Commerce's construction of the

term to encompass Company A is reasonable.  *See Chevron*, 467 U.S. at 843.

Here, Company A acquired title to Xiping's merchandise after the goods had already

entered the United States and cleared Customs by GBIE, the importer.  Under Commerce's

construction of the statute, however, Company A is an exporter of the merchandise, despite the

goods having already been exported to the United States by the producer, Xiping, and imported

by GBIE.  Commerce insists that Company A was an exporter because it was "a foreign entity

acting as a price discriminator in selling to the U.S. market."  Issues & Dec. Mem. at 6.  That is,

for the Department, Company A was an exporter, and thus, an interested party under the statute,

because it was "in a position to set the U.S. price [(export price)] of subject merchandise that

enter[ed] into the United States."  Issues & Dec. Mem. at 5.  Commerce based its determination

on the unusual timing of the sales from Xiping to GBIE, and resales from GBIE to Company

A,[21] which made it "highly likely that [Company A] agreed to resell goods back to the United

States prior to the time of importation."  Transactions Mem. at 14–15.  Moreover, for Commerce,

---

[21]     Specifically, the Department found that "GBIE's purchases from Xiping . . . were
simultaneous with its re-sales to" Company A, that "GBIE resold crawfish tail meat to a third
country (*i.e.*, [[               ]]), and" that "GBIE transferred the title to goods only days after
importation."  Transactions Mem. 14–15.

it was immaterial that the subject merchandise was in the United States when Company A

bought it.  *See* Issues & Dec. Mem. at 6 ("Whether the subject merchandise is physically located

in the United States when Company A makes the sale does not determine Company A's status as

an exporter for antidumping purposes.").

By statute, each "determination by Commerce must include 'an explanation of the basis

for its determination.'"  *See NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1320 (Fed. Cir.

2009) (quoting 19 U.S.C. 1677f(i)(3)(A)).  Thus, "[w]here the Department has reached important

conclusions that are not fully explained with reference to record evidence [and relevant statutes

or regulations], remand is appropriate for Commerce to 'explain its rationale . . . such that a court

may follow and review its line of analysis, its reasonable assumptions, and other relevant

considerations.'"  *Since Hardware (Guangzhou) Co. v. United States*, 37 CIT __, __, Slip Op.

13-71, at 15 (2013) (alteration in original) (quoting *Clearon Corp. v. United States*, 35 CIT __,

__, Slip Op. 11-142, at 27–28 (2011) (internal quotation marks omitted)).

It does not appear that the Department has adequately explained how its interpretation of

the term exporter is a permissible construction of the statute.  *See Am. Tobacco Co. v. Patterson*,

456 U.S. 63, 68 (1982) ("As in all cases involving statutory construction, [a court's] starting

point must be the language employed by Congress, and [the court] assume[s] that the legislative

purpose is expressed by the ordinary meaning of the words used." (citations omitted) (internal

quotation marks omitted)).  Here, the Department found that it was "faced with unique and

complex facts surrounding the U.S. sales in this administrative review" because "the sequence of

transactions at issue d[id] not follow the more typical, simple scenario of a single sale,

accompanied by shipment, from a foreign producer/exporter to its unaffiliated U.S. customer."

Issues & Dec. Mem. at 8.  Commerce further found that "the sales in this case ha[d] been

structured as a series of back-to-back transactions between a foreign exporter/producer, a U.S. importer, a second foreign entity and, ultimately, a U.S. buyer." Issues & Dec. Mem. at 9. While this explanation provides the reason the Department believes that the transactions deserve to be captured by the antidumping laws, it fails to say with specificity, just how it is that Company A can be said to be an exporter. That is, it has failed to explain how being a "price discriminator" alone makes an entity an exporter when the plain meaning of the word requires more, i.e., not just price setting, but movement of goods.

As to why Company A was the "price discriminator" and thus an exporter, the Department explained that "[t]he presumption built into the law and [Commerce's] practice is that the locus of dumping will be found in the first sale of subject merchandise to an unaffiliated party where the seller knows the merchandise is destined for the United States." Issues & Dec. Mem. at 9. For Commerce, "[t]his idea underlies the definitions of export price and constructed export price in the statute." Issues & Dec. Mem. at 9 (citing 19 U.S.C. § 1677a(a), (b)). This locus, however, appears to be the sale by Xiping to GBIE. Thus, when Commerce says that "the statute anticipates that the first entity—whether the producer or an exporter—who has knowledge that the sale is destined for the United States is the entity whose price setting behavior will control dumping," the transaction described is that from Xiping to GBIE, not from Company A to the U.S. wholesalers. Issues & Dec. Mem. at 9 (citing *USEC Inc. v. United States*, 27 CIT 489, 497 n.9, 259 F. Supp. 2d 1310, 1318 n.9 (2003); *Parkdale Int'l v. United States*, 30 CIT 551, 557, 429 F. Supp. 2d 1324, 1330 (2006)). Again, this explanation falls short.

Apparently, in recognition of the problem presented by the sale from Xiping to GBIE, the

Department seems to have found that the crawfish tail meat was exported[22] to the U.S. twice:

> [A]lthough the subject merchandise is shipped and enters the United States only
> once, there are two sales from two separate foreign entities attributable to each
> entry prior to the sale to an unaffiliated U.S. purchaser, with an intervening
> transaction with a U.S. importer (Xiping . . . to GBIE and Company A to U.S.
> purchasers), each of which is arguably a reviewable sale.

Issues & Dec. Mem. at 10 (footnote omitted).  Although "[t]he statute and the regulations do not

directly speak to this fact pattern," because Commerce "'has been vested with authority to

administer the antidumping laws in accordance with the legislative intent' and, thus, 'has a

certain amount of discretion [to act] . . . with the purpose in mind of preventing the intentional

evasion or circumvention of the antidumping duty law'" and "associate dumping with the party

or parties responsible for it," the Department determined that Company A's sales to U.S.

wholesalers were "the appropriate basis for U.S. price, in order to calculate an accurate dumping

margin."  Issues & Dec. Mem. at 10 (alterations in original) (citations omitted) (quoting *Tung

Mung Dev. Co. v. United States*, 26 CIT 969, 979, 219 F. Supp. 2d 1333, 1343 (2002)).

Therefore, Commerce concluded that Company A was an exporter and thus an interested party

because it was the "price discriminator" for the second sale, i.e., the sale of the merchandise from

Company A to the U.S. wholesalers.

        While the Department has succeeded in explaining its purpose in finding the transactions

to be violations (i.e., "preventing the intentional evasion or circumvention of the antidumping

duty law"), it has failed to supply an adequate explanation for its finding that Company A is an

exporter and thus, qualifies as an interested party under the statute.  *See* 19 U.S.C. § 1677(9)(A).

---

[22]        It is, of course, the case that the Department reviews sales made into the United
States, not domestic sales.  *See* 19 U.S.C. §§ 1673, 1677a, 1677b.

Although it may be that the "price discriminator" or "foreign entity . . . in a position to set the U.S. price" at importation can be found to be an exporter, under the facts of this case, Commerce appears to have omitted several steps needed before Company A can be found to be an exporter of the subject merchandise.  Issues & Dec. Mem. at 5.

First, the Department must explain how its view that there were "arguably" two reviewable sales complies with the law.  *See* Issues & Dec. Mem. at 10.  That is, if the sale from Xiping to GBIE could be reviewed as the sale of subject merchandise into the United States, it is unclear how the sale of the same merchandise from Company A to the U.S. wholesalers can also be reviewable.  As part of its explanation, the Department must state clearly how Company A is the "price discriminator" when Xiping appears to be the "first entity" that "has knowledge that the sale [of its goods] is destined for the United States" and they are "the entity whose price setting behavior will control dumping."  *See* Issues & Dec. Mem. at 9.

Relatedly, the Department must explain its finding that, when determining that an entity is an exporter, "[w]hether the subject merchandise is physically located in the United States when Company A makes the sale does not determine Company A's status as an exporter for antidumping purposes."  Issues & Dec. Mem. at 6.  Entry of subject merchandise from a foreign country into the United States is the very subject of the antidumping statute.  *See* 19 U.S.C. § 1673 ("If . . . (1) the administering authority determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and (2) the Commission determines that . . . (A) an industry in the United States . . . (i) is materially injured, or (ii) is threatened with material injury, or (B) the establishment of an industry in the United States is materially retarded, by reason of imports of that merchandise or by reason of sales (or the likelihood of sales) of that merchandise for importation, then there shall be imposed

upon such merchandise an antidumping duty, in addition to any other duty imposed, in an

amount equal to the amount by which the normal value exceeds the export price (or the

constructed export price) for the merchandise.").  Accordingly, the Department must explain

how Company A can be said to have "exported" merchandise that was in the United States when

it took ownership.  Thus, while it may be that finding Company A to be an exporter and thus an

interested party, results from "a permissible construction of the statute," the Department has yet

to demonstrate that this is the case.

　　　　Finally, the Department has not supported with substantial evidence its factual finding

that the sales from Company A to the U.S. wholesalers of Xiping's product occurred prior to the

date of importation of the merchandise or that such an agreement was in place prior to the

importation of Xiping's goods.  This factual finding is important if Company A is to be found to

be an interested party under Commerce's construction of the antidumping laws.  While

Commerce states that, "[g]iven the . . . [proximity] from the time of GBIE's importation and

entry of such goods into the United States and the timing of [Company A's] taking title to goods,

it is highly likely that [Company A] agreed to resell goods back to the United States prior to the

time of importation," it has failed to cite evidence on the record to support this assertion.  *See*

Transactions Mem. at 15.  Here, the statute places an emphasis on the price determination being

agreed upon prior to importation.  *See* 19 U.S.C. § 1677a(a) ("The term 'export price' means the

price at which the subject merchandise is first sold (or agreed to be sold) *before the date of*

*importation* by the producer or exporter of the subject merchandise outside of the United States

to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to

the United States . . . ." (emphasis added)).  The Department relies heavily on the notion that

Company A was the "price discriminator."  Absent any real evidence that the price was agreed to prior to importation, it is hard to see how this could be the case.

The court is mindful that it is because of Company A's noncompliance with Commerce's nonmarket economy questionnaires that the Department lacks the necessary information to determine the timing that the agreements between Company A and its U.S. wholesale buyers were entered into.  Nevertheless, this does not relieve the Department of its obligation to support with substantial evidence its decision to find Company A to be an exporter and thus an interested party.  Nor does the suspicious nature of the transactions relieve Commerce of its responsibility to demonstrate that its finding, that Company A is an interested party, is in accordance with law.

### B.  Legal Framework for Applying AFA

Commerce is charged with the "overriding purpose of . . . calculat[ing] dumping margins as accurately as possible."  *Parkdale Int'l v. United States*, 475 F.3d 1375, 1380 (Fed. Cir. 2007).  Although "[t]he Department generally makes its antidumping determinations based on the information it solicits and receives from interested parties concerning the normal value and export price of the subject merchandise," it may, pursuant to 19 U.S.C. § 1677e(a), use "'facts otherwise available . . . to fill in the gaps when Commerce has received less than the full and complete facts needed to make a determination' from the respondents."[23]  *Foshan Shunde*

---

[23]     The statute, which authorizes Commerce to use facts otherwise available, reads as follows:

If—
  (1) necessary information is not available on the record, or
  (2) an interested party or any other person—
    (A) withholds information that has been requested by the [Department] under
         this subtitle,

                                                                                    *(footnote continued)*

*Yongjian Housewares & Hardware Co. v. United States*, 35 CIT __, __, Slip Op. 11-123, at 6–7

(2011) (alteration in original) (quoting *Gerber Food (Yunnan) Co. v. United States*, 29 CIT 753,

767, 387 F. Supp. 2d 1270, 1283 (2005)) (internal quotation marks omitted).  Thus, "Commerce

shall fill in the gaps with 'facts otherwise available'" if any respondent significantly impedes the

Department's ability to conduct a proceeding.  *See Nippon Steel Corp. v. United States*, 337 F.3d

1373, 1381 (Fed. Cir. 2003); *AMS Assocs., Inc. v. United States*, 719 F.3d 1376, 1378, 1379–80

(Fed. Cir. 2013).

Once Commerce finds that the use of facts otherwise available is warranted under 19

U.S.C. § 1677e(a), if it finds further "that an interested party has failed to cooperate by not acting

to the best of its ability to comply with a request for information," the Department "may use an

inference that is adverse to the interests of that party in selecting from among the facts otherwise

available."  19 U.S.C. § 1677e(b).  Thus, although sometimes conflated by Courts, to use facts

available and draw an adverse inference with respect to certain of those facts requires Commerce

to make two separate decisions.

### C.  Application of AFA to a Cooperating Party

Xiping objects to Commerce's use of AFA to calculate its dumping rate based on

Company A's failure to cooperate.  It contends that, under the statute, AFA can only be applied

---

(B) fails to provide such information by the deadlines for submission of the
   information or in the form and manner requested, subject to subsections
   (c)(1) and (e) of section 1677m of this title,

(C) *significantly impedes a proceeding under this subtitle*, or

(D) provides such information but the information cannot be verified as
   provided in section 1677m(i) of this title,

the [Department] shall, subject to section 1677m(d) of this title, use the facts
otherwise available in reaching the applicable determination under this subtitle.

19 U.S.C. § 1677e(a) (emphasis added).

against an uncooperative party, and, while Company A may not have cooperated, Xiping itself

was found to have fully cooperated in the review.[24]  *See* Br. in Supp. of Pl.'s Rule 56.2 Mot. for

J. upon the Agency R. 10–11 (ECF Dkt. No. 26).

Even if Company A is an interested party for purposes of the unfair trade laws, the

question remains as to whether the Department's finding that Company A significantly impeded

the proceeding, may result in the application of AFA to the facts relating to Xiping's rate.  That

is, 19 U.S.C. § 1677e(b) provides that the Department may apply AFA to the facts used to find

an antidumping duty rate for an uncooperative, interested party.  *See* 19 U.S.C. § 1677e(b) ("If

[Commerce] finds that an interested party has failed to cooperate by not acting to the best of its

ability to comply with a request for information[, Commerce] . . . may use an inference that is

adverse to the interests of *that party* in selecting from among the facts otherwise available."

(emphasis added)).  Thus, in most cases, AFA is applied to the facts relating to the dumping

margin of a party that does not cooperate.  Here, however, Commerce has found Xiping itself to

be cooperative.

While not the usual case, recently, the Federal Circuit has found that, under certain

circumstances, Commerce may apply adverse inferences in such a way that they extend to

instances when doing so has "collateral effects" on a cooperating respondent.  In *Mueller*

---

[24]        In the Preliminary Results, Commerce determined that it "received a complete
response to the antidumping questionnaire from Xiping."  Preliminary Results, 76 Fed. Reg. at
62,351.  Thus, Commerce preliminarily relied on the factors of production data submitted by
Xiping to calculate normal value.  Preliminary Results, 76 Fed. Reg. at 62,353.  In its Final
Results, the Department continued to maintain that Xiping fully cooperated in the review.  *See*
Issues & Dec. Mem. at 12–13 ("While it is Company A that has failed to cooperate by not acting
to the best of its ability with the Department's request for cooperation with respect to the
appropriate U.S. sales price, the lack of cooperation reasonably results in the application of an
adverse inference applicable to the calculation of the dumping margin for the sales and entries
made by Xiping . . . with Company A, in this review.").

*Comercial de Mexico, S. de R.L. de C.V. v. United States*, the Court held that Commerce is not

prohibited "from drawing adverse inferences against a non-cooperating party that have collateral

consequences for a cooperating party." *Mueller*, 753 F.3d at 1236.  In *Mueller*, an exporter

under review purchased its merchandise from two suppliers, one of which would not provide

data requested by Commerce.[25]  *Id.* at 1230.  As a consequence of this supplier's failure to

cooperate, cost of production data needed to calculate the normal value of the subject

merchandise sold by the exporter was absent from the record.  *See id.*  Because the Department

lacked necessary cost data, Commerce used facts otherwise available to calculate the exporter's

dumping margin.  *Id.*

      Further, despite the exporter having fully cooperated with Commerce's review, the

Department applied an adverse inference to the facts it used to calculate the uncooperative

supplier's costs of production.  *See id.*  Specifically, Commerce applied an adverse inference to

the production costs of the goods that the exporter acquired from the uncooperative supplier.  *See*

*id.*  This adverse inference resulted in a higher normal value for the cooperative respondent's

merchandise, and therefore, a higher dumping margin for that respondent.  *Id.* at 1232.

      In upholding the Department's practice in that instance, the Federal Circuit explained

that, if a cooperating party was in a position to induce a non-cooperating party to supply needed

information and failed to do so, AFA could be used to determine the cooperating party's rate.  *Id.*

at 1236.  The Federal Circuit reasoned that, if a cooperating party is in a position where it "could

and should . . . induce[ another company's] cooperation by refusing to do business with" it, AFA

---

[25]     The uncooperative supplier was reviewed by the Department, but "opted not to
participate in its own margin calculation."  *Mueller*, 753 F.3d at 1229.  As a consequence,
Commerce applied an adverse inference to determine the uncooperative supplier's dumping
margin.  *Id.*

can be used "as part of a margin determination for a cooperating party[,] . . . as long as the

application of those policies is reasonable on the particular facts and the predominant interest in

accuracy is properly taken into account as well." *Id.* at 1233.  The Court cautioned, however,

that, where "the cooperating entity has no control over the non-cooperating suppliers, a resulting

adverse inference is potentially unfair to the cooperating party." *Id.* at 1235 (citing *SKF USA*

*Inc. v. United States*, 630 F.3d 1365, 1375 (Fed. Cir. 2011)).  In other words, because a primary

interest of the statute is to prevent the evasion of antidumping duties, the "theory of inducement"

may supply the rationale for using AFA-derived facts to determine the margin for a cooperating

respondent.  As a result, where a cooperating respondent is in a position to induce a non-

cooperating party to comply with Commerce's requests for information during a review, and has

failed to do so, the Department may be justified in applying an adverse inference to calculate the

cooperating party's antidumping duty rate.[26]

Moreover, even though, here, Commerce found that Company A was an exporter, it did

not determine an antidumping duty rate for Company A because it found that "the record

evidence establishe[d] that Xiping . . . shipped all subject merchandise that Company A sold to

the United States."  Issues & Dec. Mem. at 13.  Also, the Department stated that, "because the

---

[26]        The Federal Circuit's opinion in *Fine Furniture (Shanghai) Ltd. v. United States*
is not inapposite to the court's conclusions.  *See Fine Furniture (Shanghai) Ltd. v. United States*,
748 F.3d 1365 (Fed. Cir. 2014).  *Fine Furniture* was a countervailing duty case, not a dumping
case.  Thus, Commerce's purpose was to determine if the company's product was being
subsidized.  The PRC government refused to answer questionnaires relating to the cost of
electricity that it supplied.  The Federal Circuit confirmed the use of AFA to encourage the PRC
government to cooperate in future investigations and because the plaintiff could be presumed to
have taken advantage of the subsidized electricity from the PRC government.  *See Fine*
*Furniture*, 748 F.3d at 1373 ("In the present case, Fine Furniture is a company within the country
of China, benefitting directly from subsidies the government of China may be providing, even if
not intending to use such subsidy for anticompetitive purposes.  Therefore, a remedy that
collaterally reaches Fine Furniture has the potential to encourage the government of China to
cooperate so as not to hurt its overall industry.").

identity of Company A [was] not apparent in any entry documentation, there [was] no practical

reason to establish a rate that [was] associated with any entity other than Xiping."  Issues & Dec.

Mem. at 13.  Nonetheless, the Department found it appropriate to apply AFA to Xiping.

This use of AFA, however, runs afoul of the Federal Circuit's reasoning in *Changzhou*

*Wujin Fine Chemical Factory Co. v. United States*, where Commerce used AFA to determine a

cooperating respondent's rate based on the behavior of non-cooperating companies even though

the parties were also found to be unrelated, unaffiliated companies.  *See Changzhou Wujin Fine*

*Chem. Factory Co. v. United States*, 701 F.3d 1367, 1375–76 (Fed. Cir. 2012).  The Federal

Circuit, however, found that the use of AFA to construct a rate for a cooperating party was

improper where the use of adverse inferences had no impact on the parties that had failed to

cooperate.  "Although the hypothetical AFA rate was not *directly* applied to a cooperating

respondent, cooperating respondents were the *only* entities impacted by the recalculated rate."

*Id.* at 1378.  In other words, for the Court, because the claimed use of AFA had no impact on the

uncooperative parties, the Department was prohibited from drawing adverse inferences in

assigning an AFA rate to companies found to have fully cooperated.  *See id.* at 1379.  "The

hypothetical AFA rate Commerce generated on remand was an 'AFA rate' in name only: its sole

purpose was to serve as a value in the recalculation of the separate rate.  The hypothetical AFA

rate was not assigned to any individually investigated entity, and only affected cooperating

respondents."  *Id.* at 1375–76.  Here, as in *Changzhou*, the non-cooperating party, Company A,

suffered no adverse consequences from its failure to cooperate, and as to Company A, AFA was

applied in "name only."  In other words, the only entity impacted by the calculated rate was the

cooperating respondent, Xiping.

**D. The Department's Determination to Apply AFA to Xiping Lacks Sufficient Explanation**

In the present review, Commerce found that it lacked sufficient information to calculate a dumping margin for Xiping.  The Department reached this conclusion after finding that there were two reviewable sales and that Company A's refusal to answer the questionnaires prevented it from learning U.S. sales and pricing information for the second sale, i.e., the sale from Company A to the U.S. wholesalers.  As a result, Commerce applied "facts otherwise available" under subsection (a) of the statute to find the export price (U.S. price) for Xiping's merchandise. *See* 19 U.S.C. § 1677e(a) (stating that "facts otherwise available" is used when "necessary information is not available on the record").

As facts available, Commerce chose the price calculated by defendant-intervenor based on the offering prices by the wholesalers to the retailers.  The Department determined further, however, that, as a result of Company A's refusal to cooperate, an adverse inference was warranted under section 1677e(b), not to determine an antidumping rate for Company A, but to calculate Xiping's dumping margin.  *See* 19 U.S.C. § 1677e(b).  In doing so, the Department applied an adverse inference to calculate Xiping's export price (U.S. price) by selecting the lowest price available on the record for the inferred amount charged by Company A to U.S. wholesalers for Xiping's crawfish tail meat.  *See* AFA Mem. at 7.  In addition, the Department applied an adverse inference as part of its normal value calculation, relying on Company A's highest acquisition cost, based on the GBIE invoices for Xiping's crawfish tail meat sold to Company A.  AFA Mem. at 7.  Thus, the Department used facts available and applied adverse facts available when determining both Xiping's export price and normal value.  The court finds Commerce's explanation for its authority to apply an AFA rate to both to be insufficient.

*1.  Export Price*

Commerce determined that, as a result of Company A's failure to cooperate, "an adverse inference [was] warranted in determining a dumping margin for Xiping."  Issues & Dec. Mem. at 3–4.  Given Commerce's express finding, however, that Xiping was a fully cooperative party in this review, the Department's basis for calculating a dumping margin for Xiping exclusively based on AFA is unclear to the court.

Commerce concluded that none of Xiping, GBIE, or Company A were related companies.  Nor was there a finding that Xiping was in a position to induce Company A's cooperation.  In addition, Commerce did not use AFA to calculate a rate for Company A.  Although the Federal Circuit has made clear that, under section 1677e(b), Commerce may "draw[ an] adverse inference[] against a non-cooperating party that ha[s] collateral consequences for a cooperating party," when the cooperating party is in a position to induce the non-cooperating party to supply information, Commerce has cited to no record evidence indicating that Xiping could have induced Company A to cooperate.  *See Mueller*, 753 F.3d at 1236; 19 U.S.C. § 1677e(b).  Also, Commerce did not apply AFA to non-cooperating Company A, but only to cooperating Xiping.  Commerce, however, has thus not provided an explanation for its actions that takes current case law into account.

Rather, Commerce's entire explanation is that, because of Xiping's "admitted presence and knowledge of the market, it would have had reason to know that its shipments of subject merchandise were ultimately being sold at less than GBIE's buyer's acquisition cost to unaffiliated U.S. purchasers," and that Xiping would have been "aware that wholesalers' prices were significantly lower than the selling price it reported to the Department."  Issues & Dec. Mem. at 13 (citing Transactions Mem. at 8–9).  According to Commerce, this is so "because the

record evidence establishe[d] that Xiping . . . shipped all subject merchandise that Company A

sold to the United States." Issues & Dec. Mem. at 13. Thus, Commerce concludes that,

"because [*Company A*] did not cooperate by acting to the best of its availability, . . . an adverse

inference [was] warranted in determining a dumping margin for *Xiping*." AFA Mem. at 6

(emphasis added).

Commerce, however, cites no statute, regulation, or case law permitting the application of

AFA based on imputed knowledge. Nor does it give a complete explanation for why such

knowledge, even if lawfully imputed, would result in the application of AFA. The Department

is, of course, correct that the purpose of the antidumping laws is to stop dumping. The statute

itself, however, must be used as the means to do so and the statute relies both on the policy cited

by Commerce and on the methods it authorizes. If, on remand, the Department continues to

employ the imputation of knowledge to justify the use of AFA to calculate Xiping's export price,

it must complete its thought and explain why knowledge of the marketplace is sufficient for the

application of AFA to the facts.

In addition, in light of the Federal Circuit's decision in *Mueller*, the Department is to

fully explain, what, if any, relevance *Mueller* has to the calculation of Xiping's dumping margin.

That is, Commerce is to explain the relevance of *Mueller*'s "inducement/evasion considerations,"

which might permit the application of AFA to a cooperating party in the context of the facts of

this case. *See Mueller*, 753 F.3d at 1236. Finally, the Department must address the reasoning in

*Changzhou*, and why it is permitted, here, to determine a rate for a cooperating party (Xiping),

using AFA, that has no impact on the party that failed to cooperate in the review (Company A).

*See Changzhou*, 701 F.3d at 1378.

Thus, on remand, the Department must clarify its legal basis for calculating an AFA rate

for Xiping, a party it found to have cooperated fully with Commerce's investigation.  *See GPX*

*Int'l Tire Corp. v. United States*, 37 CIT __, __, 942 F. Supp. 2d 1343, 1359 (2013) ("Typically,

Commerce cannot rely on an unaffiliated party's failure to cooperate to justify the application of

an AFA rate unless the exporter under investigation also is found responsible for the behavior in

some way." (citations omitted)).


   *2.  Normal Value*

The application of AFA to the facts used to determine the normal value of Xiping's

merchandise requires even more explanation.  In the Preliminary Results, Commerce used its

factors of production methodology[27] to calculate Xiping's normal value.  Preliminary Results, 76

Fed. Reg. at 62,353.  In doing so, the Department relied on the factors of production data

reported by Xiping for the POR and then priced these factors using publicly available data from

---

[27]      As noted, because the Department considers the PRC to be a nonmarket economy
country, sales and financial information obtained from Chinese producers are generally found by
Commerce to be unreliable for determining the normal value of the subject merchandise.
*Shanghai Foreign Trade*, 28 CIT at 481, 318 F. Supp. 2d at 1341.  Thus, Commerce employs its
factors of production methodology

   to determine the normal value of exported merchandise by pricing the factors of
   production used to produce the merchandise.   Commerce does so by using
   surrogate data from "one or more market economy countries that are—(A) at a
   level of economic development comparable to that of the [exporter's] country,
   and (B) significant producers of comparable merchandise" and then "add[ing] an
   amount for general expenses and profit plus the cost of containers, coverings, and
   other expenses."

*Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 37 CIT __, __ n.2, Slip Op. 13-30, at 3
n.2 (2013) (alterations in original) (quoting 19 U.S.C. § 1677b(c)(1), (4)(A)–(B)).

India, Spain, and Indonesia.[28]  *See* Preliminary Results, 76 Fed. Reg. at 62,351.  This is, of

course, the method authorized by Congress.  *See* 19 U.S.C. § 1677b(a).

In the Final Results, however, having previously determined in its Post-Preliminary

Analysis Memorandum that the record demonstrated that Xiping's sales to GBIE were not based

on normal commercial considerations, the Department declined to use Xiping's factors of

production information to calculate normal value.  Issues & Dec. Mem. at 12 ("We also disagree

with Xiping . . . that we should use its information in our final results. . . . [T]he record evidence

demonstrates that the sales from Xiping . . . to GBIE are not based on normal commercial

considerations." (citations omitted)).  Specifically, the Department determined that Xiping's

sales of crawfish tail meat to GBIE were "not based on normal commercial considerations" for

the following reasons: (1) Xiping had failed to "provide a reasonable explanation for the factors

accounting for the drastic increases in its U.S. prices and quantities in relation to the last POR

and in relation to its competitors"; (2) Xiping had failed to "explain the wide gap between its

U.S. prices and the average prevailing U.S. market prices at the wholesale level"; (3) Xiping and

GBIE had failed to "identify the specific sources of information that both parties considered in

their negotiations in gauging the prevailing U.S. market prices involving large quantities of

subject merchandise"; "(4) [t]he exclusivity of the commercial relationship between Xiping . . .

and GBIE and between GBIE and Company A"; "(5) GBIE did not demonstrate any reason for

its incorporation beyond acting as an importer of record for Xiping['s] . . . shipments or how

---

[28]          Although, in the Preliminary Results, India was selected as the primary surrogate
country, the Department lacked Indian data to value whole crawfish and the crawfish shell by-
product.  Preliminary Results, 76 Fed. Reg. at 62,351.  Commerce therefore used Spain and
Indonesia to value these inputs because they were found to be the only two countries with
available information on the record to value whole crawfish and the crawfish shell by-product.
*See* Preliminary Results, 76 Fed. Reg. at 62,351.

GBIE's activities amounted to a meaningful or active commercial role in the U.S. market"; "(6)

Xiping['s] . . . U.S. sales did not enter the stream of commerce in the United States because

GBIE's purchases from Xiping . . . were back-to-back with its re-sales to Company A, GBIE

resold crawfish tail meat to a third-country entity, and GBIE transferred title of the subject

merchandise to Company A only days after importation"; and "(7) [t]he high likelihood that

Company A agreed to resell subject merchandise back to the United States prior to importation,

given Company A's agreement to purchase subject merchandise from GBIE well prior to the

date of importation into the United States."  Issues & Dec. Mem. at 11–12 (citing Transactions

Mem. at 6, 8, 13, 14, 15; AFA Mem. at 3–4).  Thus, having "evaluat[ed] the nature of the

transactions under review," the Department "concluded that it was appropriate to initiate an

inquiry of Company A because it 'appear[ed] to be an exporter that ha[d] made, or ha[d]

participated in making, the first sales to unaffiliated U.S. purchasers.'"  Issues & Dec. Mem. at

12 (quoting Transactions Mem. at 15–16).

Having established the questionable nature of the transactions, the Department then

decided to construct a normal value for Xiping's crawfish tail meat.  Thus, rather than rely on

Xiping's factors of production information to calculate normal value, the Department relied on

Company A's acquisition costs of subject merchandise from GBIE.  *See* AFA Mem. at 7.  These

costs were derived from GBIE's answers to the Department's questionnaires.  *See* AFA Mem. at

7 ("With respect to normal value, we relied on [Company A's] acquisition costs.  The acquisition

costs represent GBIE's sales prices of Xiping['s] . . . product to [Company A] throughout the

POR.").  The Department then applied AFA to these costs.  *See* AFA Mem. at 7 ("Specifically,

as AFA, we used [Company A's] highest acquisition cost during the POR based on our

examination of all the prices that GBIE invoiced for crawfish tail meat to [Company A].  Record

evidence contains 34 sample invoices that we requested and obtained from GBIE." (citations

omitted)).

The Department thus took the sales prices to GBIE that would usually be used to

establish the export price (U.S. price) and instead used these costs rather than Xiping's

production costs as the basis for finding normal value.  It then used AFA to justify using the

highest of these costs as Xiping's normal value.  The Department's decision to apply AFA to the

determination of Xiping's normal value is completely unexplained.

Because nonmarket economy countries do "not operate on market principles of cost or

pricing structures, so that sales of merchandise in such countr[ies] do not reflect the fair value of

the merchandise," where, as here, merchandise is exported from a nonmarket economy country,

the Department is directed by statute to "determine the normal value of the subject merchandise

on the basis of the value of the factors of production utilized in producing the merchandise."  19

U.S.C. § 1677(18)(A); 19 U.S.C. § 1677b(c)(1).  Xiping asks the court to direct Commerce to

use the factors of production methodology that it employed in the Preliminary Results to

calculate Xiping's normal value.  *See* Pl.'s Rule 56.2 Mot. for J. upon the Agency R. 1 (ECF

Dkt. No. 26) ("Plaintiff . . . respectfully moves for judgment upon the agency record and for an

order remanding to [Commerce the Final Results], with instructions to calculate an antidumping

duty rate for [p]laintiff based upon the reported sales and factors of production data rather than

through the application of any adverse facts available.").

The court finds that Commerce has not provided a sufficient explanation (or indeed any

explanation at all) for not determining Xiping's normal value based on its factors of production.

Indeed, even if it is ultimately found that AFA can be properly applied to the facts of Company

A's U.S. pricing, a complete explanation for using anything other than the factors of production

to determine Xiping's normal value is needed.  In supplying its explanation, the Department

must keep in mind that, even if Company A is found to be an interested party, no one withheld

information as to the costs of production and no interested party failed to cooperate with a

request for information relating to the costs of production.  Thus, Commerce has failed to explain

the use of facts available, let alone AFA.  This Court has repeatedly held that, absent a specific

finding that reported information by a respondent is inaccurate or deficient, Commerce's

decision to ignore that information as part of its determination renders its conclusion

unsupported by substantial evidence.  *See, e.g.*, *Yantai Xinke Steel Structure Co. v. United States*,

36 CIT __, __, Slip. Op. 12-95, at 27 (2012); *Since Hardware (Guangzhou) Co. v. United States*,

34 CIT __, __, Slip Op. 10-108, at 15–16 (2010).

Because of the odd structure of the transaction, the Department's suspicions about the

bona fides of the behavior of the entities involved are fully justified.   There appears to be no

other explanation for these gyrations than to avoid a finding of dumping.  Indeed, the defendant-

intervenor seems to have made out a good case that the transaction amounted to middleman

dumping.  Thus, on remand, if the Department wishes, it may pursue a middleman dumping

investigation as part of its determination to capture the dumping of Xiping's merchandise in the

United States.  In any event, Commerce must clearly explain how the transactions violated the

statute and how the remedy it seeks to use is grounded in the law and the facts.

## CONCLUSION and ORDER

Based on the foregoing, it is hereby

ORDERED that the Department's Final Results are REMANDED; it is further

ORDERED that, on remand, Commerce issue a redetermination that complies in all respects with this Opinion and Order, is based on determinations that are supported by substantial record evidence, and is in all respects in accordance with law; it is further

ORDERED that the Department explain how its construction of the word exporter as a "price discriminator" is a proper construction of the statute; it is further

ORDERED that the Department explain clearly how Company A is the "price discriminator" of Xiping's merchandise when it is Xiping that appears to be the "first entity" that "has knowledge that the sale [of its goods] is destined for the United States" and "is the entity whose price setting behavior will control dumping"; it is further

ORDERED that Commerce fully explain its determination that there were two reviewable sales (i.e., from Xiping to GBIE and from Company A to U.S. wholesalers), and how this complies with the law; it is further

ORDERED that, should the Department continue to proceed as though Company A is an exporter for purposes of 19 U.S.C. § 1677(9)(A), it must fully explain how this determination complies with the law, given that Company A took ownership to the merchandise and subsequently sold it to U.S. wholesalers after the goods had already entered the United States and cleared Customs; it is further

ORDERED that Commerce support its determination, that "it is highly likely that [Company A] agreed to resell goods back to the United States prior to the time of importation," with substantial evidence; it is further

ORDERED that the Department fully explain the relevance of its findings that, given Xiping's "admitted presence and knowledge of the market, it would have had reason to know that its shipments of subject merchandise were ultimately being sold at less than GBIE's buyer's

acquisition cost to unaffiliated U.S. purchasers," and that Xiping would have been "aware that wholesalers' prices were significantly lower than the selling price it reported to the Department," and why Xiping's knowledge of the marketplace is sufficient for the application of AFA; it is further

ORDERED that Commerce explain the relevance, if any, of the Federal Circuit's "inducement/evasion considerations" to its determination to assign an AFA rate to Xiping, a party found to have fully cooperated in this review; it is further

ORDERED that the Department address the Federal Circuit's reasoning that a rate may not be determined for a cooperating party using AFA where the calculated rate has no impact on the entity that failed to cooperate; it is further

ORDERED that the Department fully explain its determination to assign an AFA rate to Xiping, a party it found to have fully cooperated in this review, based on Company A's noncompliance; it is further

ORDERED that Commerce fully explain why it is permitted by law and the facts of this case to treat Company A's sales price to U.S. wholesalers as the export price (U.S. price); it is further

ORDERED that Commerce fully explain its determination to use Company A's acquisition costs (or GBIE's sales price of Xiping's product) rather than base Xiping's normal value on the value of its factors of production as used in the Preliminary Results, and why it is permitted by law to ignore Xiping's reported factors of production information; it is further

ORDERED that, if the Department wishes, it may pursue a middleman dumping investigation as part of its determination; it is further

ORDERED that Commerce may reopen the record to solicit any information it determines to be necessary to make its determination; and it is further

ORDERED that the remand results shall be due on March 11, 2015; comments to the remand results shall be due thirty (30) days following filing of the remand results; and replies to such comments shall be due fifteen (15) days following filing of the comments.

Dated:          December 11, 2014
                New York, New York


                                    _____/s/ Richard K. Eaton_____
                                          Richard K. Eaton