Slip Op. 17–38

## UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                 :

XIPING OPECK FOOD CO., LTD.,    :

                :

        Plaintiff,          :

                :

         v.           :       Before: Richard K. Eaton, Judge

                :

UNITED STATES,         :       Court No. 12-00112

                :

        Defendant,       :       **PUBLIC VERSION**

                :

        and          :

                :

CRAWFISH PROCESSORS ALLIANCE,  :

                :

        Defendant-Intervenor.  :

_____:

## OPINION and ORDER

[Commerce's Final Results of Redetermination are sustained.]

Dated: April 5, 2017

*Yingchao Xiao*, Lee & Xiao, of San Marino, CA, argued for plaintiff.

*Antonia R. Soares*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director. Of counsel on the brief was *Rebecca Cantu*, Attorney, International Office of Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

*John C. Steinberger*, Adduci, Mastriani & Schaumberg, LLP, of Washington, DC, for defendant-intervenor. With him on the brief was *Will E. Leonard*.

Eaton, Judge: Before the court are the United States Department of Commerce's ("Commerce" or the "Department") Final Results of Redetermination Pursuant to Court Remand.

*See Final Results of Redetermination Pursuant to Ct. Remand* (Dep't Commerce June 9, 2015),

ECF No. 57-1 ("Remand Results"). These results follow the court's order remanding the final

results of the Department's 2009-2010 administrative review of the antidumping duty order on

freshwater crawfish tail meat from the People's Republic of China ("PRC"). *Xiping Opeck Food

Co. v. United States*, 38 CIT __, 34 F. Supp. 3d 1331 (2014) ("*Xiping Opeck I*"); *Freshwater

Crawfish Tail Meat From the People's Republic of China*, 77 Fed. Reg. 21,529 (Dep't

Commerce Apr. 10, 2012) (final results of antidumping duty admin. rev.) ("Final Results"), and

accompanying Issues and Decision Memorandum, A-570-848, (Apr. 4, 2012), PD[1] 35 ("Issues &

Dec. Mem."); *Freshwater Crawfish Tail Meat From the PRC*, 62 Fed. Reg. 48,218 (Dep't

Commerce Sept. 15, 1997) (notice of amendment to final determination of sales at less than fair

value and antidumping duty order) (the "Order").[2]

   Shifting from the dumping analysis applied in the Final Results, in the Remand Results

the Department employed a modification of its middleman dumping methodology to capture the

transactions by which the subject crawfish tail meat entered the United States. In its comments,

---

[1]      "PD" refers to a document contained in the public administrative record, and "CD" refers to a document contained in the confidential administrative record, both of which are found in ECF No. 21, unless otherwise noted.

[2]      The merchandise subject to the Order is described as:

freshwater crawfish tail meat, in all its forms (whether washed or with fat on, whether purged or un-purged), grades, and sizes; whether frozen, fresh, or chilled; and regardless of how it is packed, preserved, or prepared. Excluded from the scope of the order are live crawfish and other whole crawfish, whether boiled, frozen, fresh, or chilled. Also excluded are saltwater crawfish of any type, and parts thereof.

Final Results, 77 Fed. Reg. at 21,529-30.

plaintiff Xiping Opeck Food Co. Ltd. ("plaintiff" or "Xiping") argues that the court should reject

the Remand Results as unsupported by substantial evidence and not in accordance with law. *See*

Pl.'s Cmts. on Final Results of Redetermination Pursuant to Ct. Remand, ECF No. 60 ("Pl.'s

Cmts."). The United States Government, on behalf of Commerce, urges the court to sustain the

Remand Results.[3] *See* Def.'s Resp. Pl.'s Cmts. Final Results of Remand Redetermination, ECF

No. 64.

Jurisdiction lies pursuant to 28 U.S.C. § 1581(c) (2012) and 19 U.S.C.

§ 1516a(a)(2)(B)(i) (2012).[4] For the reasons discussed below, the court sustains the Remand

Results.


## BACKGROUND

In the Final Results, and now in the Remand Results, the Department concluded that

Xiping's crawfish tail meat was sold into the United States at less than fair value. In the Remand

Results, the Department calculated an antidumping duty rate for Xiping's entries of 70.12

percent.[5] Remand Results at 3.

---

[3]        Defendant-intervenor Crawfish Processors Alliance did not file comments on the Remand Results.

[4]        Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[5]        Commerce only calculated a dumping margin for Xiping's crawfish tail meat for the September 1, 2009, through August 31, 2010 period of review. Remand Results at 19 n.60 ("We note that given the timing, this rate will only be used for purposes of assessing duties on the entries subject to the review and not serve as a cash deposit rate. For cash deposit purposes, Xiping Opecks's [sic] rate in this review has been superseded by subsequent reviews, and the only issue that remains is the proper liquidation of the entries at issue."); *see Freshwater*

(footnote continued)

## I. THE TRANSACTION CHAIN

Xiping characterized the transaction chain by which its crawfish tail meat was exported to the United States as follows: (1) Xiping, as exporter, sold its crawfish tail meat to GB Import & Export, Inc. ("GBIE"), a U.S. corporation, which acted as Xiping's importer and was its first unaffiliated U.S. customer; (2) GBIE sold the crawfish tail meat to Chinese Company A[6] (another unaffiliated down-stream purchaser); and (3) Chinese Company A then sold the crawfish tail meat to U.S. wholesalers.[7] Pl.'s Cmts. 19-20.

On remand, the Department has ignored the claimed first sale to GBIE after finding it to be commercially unreasonable. Thus, Commerce re-characterized the transaction chain as being (1) a sale from Xiping, as producer, to Chinese Company A; and (2) a sale from Chinese Company A, as exporter, to the U.S. wholesalers. *See* Remand Results at 11-12.

---

*Crawfish Tail Meat From the PRC*, 75 Fed. Reg. 66,349, 66,350 (Dep't Commerce Oct. 28, 2010) (initiation of antidumping and countervailing duty admin. revs.).

[6] The identity of Chinese Company A [[                                    ]] is confidential at the request of GBIE. Issues & Dec. Mem. at 2 n.2; Mem. for Evaluation of Middleman Dumping and Nature of Transactions, CD 12 (Sept. 30, 2011) ("Transactions Mem.") at 2.

[7] Because Chinese Company A failed to answer Commerce's questionnaires regarding its U.S. sales, specific information regarding those sales is missing from the record. Remand Results at 5. Nevertheless, Commerce found that the record contained convincing evidence that four U.S. wholesalers—Ocean Harvest, Propax, Corrigan, and Fishline— "handl[ed] Xiping Opeck's product," and therefore, because "[[       ]] percent of Xiping Opeck's U.S. sales during the POR were made through the same GBIE-[Chinese Company A] channel," Commerce determined that "all four entities were downstream purchasers from [Chinese Company A]." Transactions Mem. at 2–3, 9.

## II. MIDDLEMAN DUMPING ALLEGATION LETTER

On September 8, 1997, the Department published the antidumping duty order on crawfish tail meat from the PRC. *See* Order, 62 Fed. Reg. at 48,218. On October 28, 2010, after defendant-intervenor Crawfish Processors Alliance ("defendant-intervenor") filed a letter alleging middleman dumping[8] by Chinese Company A, the Department initiated an administrative review of the Order for the period of review of September 1, 2009, through August 31, 2010 ("POR"). *See Freshwater Crawfish Tail Meat From the PRC*, 75 Fed. Reg. 66,349, 66,350 (Dep't Commerce Oct. 28, 2010) (initiation of antidumping and countervailing duty admin. revs.); Letter from John C. Steinberger, Counsel for the Crawfish Processors Alliance, to the Honorable Gary Locke, Secretary of Commerce, U.S. Department of Commerce, CD 27 (June 6, 2011) ("Middleman Dumping Allegation Letter") at 2.

In its letter, the defendant-intervenor described Xiping's sales of crawfish tail meat to GBIE, and the subsequent sales of the merchandise to Chinese Company A. The letter asserted that Chinese Company A resold Xiping's merchandise to U.S. wholesalers at prices below its acquisition cost. Defendant-intervenor alleged that the various sales made prior to the sales to U.S. wholesalers were designed to avoid dumping duties by creating the appearance of fair value sales from Xiping to GBIE. For defendant-intervenor, these claimed sales to GBIE were intended to obscure their true nature, as well as Chinese Company A's acquisition price and its sales

---

[8]     Although there have been few of these investigations, middleman dumping is normally thought of as less than fair value sales into the United States by a foreign reseller of a foreign respondent producer's merchandise, rather than by the respondent producer itself. *See* S. REP. NO. 96–249, at 94 (1979), *as reprinted in* 1979 U.S.C.C.A.N. 381, 480. As shall be seen, although the Department used information from defendant-intervenor's Middleman Dumping Allegation Letter, it did not pursue a middleman dumping investigation in its Final Results. In its Remand Results, however, the Department conducted a middleman dumping inquiry.

prices to the U.S. wholesalers. *See* Middleman Dumping Allegation Letter at 6-7. In other words, according to defendant-intervenor, Xiping was engaged in middleman dumping, and the sales were structured to mask that dumping.

### III. *Xiping Opeck I*: Review of Commerce's Final Results

Commerce is charged with determining if goods are being sold, or are likely to be sold, in the United States at less than fair value. This determination is based on a comparison of normal value and export price. 19 U.S.C. § 1673. The Department calculates a dumping margin for the subject merchandise by determining the amount by which normal value (home market price) exceeds export price (U.S. price). 19 U.S.C. § 1677(35)(A). Commerce then uses this margin to determine an antidumping duty rate.

Under the usual set of facts, middleman dumping is the below cost sale in the United States by a reseller of a respondent producer's merchandise. *See Tung Mung Dev. Co. v. United States*, 354 F.3d 1371, 1374 (Fed. Cir. 2004) ("*Tung Mung III*") (citing S. Rep. No. 96-249, at 94 (1979), *as reprinted in* 1979 U.S.C.C.A.N. at 480). That is, middleman dumping occurs when a producer sells its merchandise to a middleman or reseller, and then the middleman resells the merchandise at less than fair value into the United States.[9] Accordingly, a middleman dumping analysis may be appropriate when there is more than one sale before the subject merchandise is sold to an unaffiliated U.S. purchaser. *See id*.

---

[9]      Under the usual middleman dumping facts the Department may find dumping both in the sale (1) by the producer to the reseller and (2) by the reseller to the U.S. purchaser. As shall be seen, Commerce was unable to determine two instances of dumping here.

Despite defendant-intervenor's middleman dumping allegation, in its preliminary results Commerce determined that the middleman dumping analysis was not "the appropriate vehicle by which to examine the transactions relevant to the entries subject to this review." *Freshwater Crawfish Tail Meat From the PRC*, 76 Fed. Reg. 62,349 (Dep't Commerce Oct. 7, 2011) (prelim. results of antidumping duty admin. rev. and rescission of rev. in part). Thereafter, in its Final Results, Commerce calculated a dumping margin for Xiping based upon Chinese Company A's purchase and sales prices. *See* Final Results, 77 Fed. Reg. at 21,530. The Department applied the resulting dumping margin to Xiping based upon Xiping's knowledge that its goods were sold into the United States at less than fair value. *Xiping Opeck I*, 38 CIT at __, 34 F. Supp. 3d at 1340–41 & n.18. The court remanded the Final Results, and because of the structure of the transactions, suggested that the Department might reconsider whether a middleman dumping analysis was appropriate. *Id.* at __, 34 F. Supp. 3d at 1354 ("Because of the odd structure of the transaction, the Department's suspicions about the bona fides of the behavior of the entities involved are fully justified. There appears to be no other explanation for these gyrations than to avoid a finding of dumping. Indeed, the defendant-intervenor seems to have made out a good case that the transaction amounted to middleman dumping. Thus, on remand, if the Department wishes, it may pursue a middleman dumping investigation as part of its determination to capture the dumping of Xiping's merchandise in the United States.").

## IV. THE REMAND RESULTS

On remand, the Department changed course and applied a modified middleman dumping analysis. Remand Results at 3, 11. The Department found that Xiping's product had been sold at less than fair value by Chinese Company A, even though Chinese Company A had purchased the

product from the supposed U.S. importer GBIE. The structure of the transactions thus presented

a methodological problem for the Department because, in a traditional middleman dumping case,

the first sale would be by the producer to an unaffiliated purchaser in its home country, in this

case China. The purchaser would then sell the product to U.S. purchasers. This methodology is

set out in Commerce's Antidumping Manual:

> D. Special Circumstances Involving Unaffiliated Middleman Sales
>
> Very infrequently, a manufacturer or producer may sell to an unaffiliated trading company, or middleman, in the home market or in a third country, and this company may resell the merchandise to the United States at prices which do not permit recovery of its acquisition and selling costs. At the time of the sale to the middleman, the producer has knowledge[10] of U.S. destination. If this is the case and the Department receives a documented allegation that the trading company is reselling to the United States at prices which do not permit the recovery of its acquisition and selling costs, we will initiate a middleman dumping investigation.

U.S. DEP'T OF COMM., ENFORCEMENT AND COMPLIANCE ANTIDUMPING MANUAL, ch. 7 at 5

(Mar. 16, 2015) ("ANTIDUMPING MANUAL"). Here, according to Xiping, the first purported sales

were to GBIE, a claimed U.S. importer, rather than to a purchaser in China. Xiping asserts that

U.S. importer GBIE then sold the crawfish tail meat to Chinese Company A, which then sold it

to the U.S. wholesalers. The methodological problem for Commerce, then, was that there

---

[10]    As shall be seen, the Federal Circuit has held that, under Commerce's middleman dumping approach, mere knowledge that the product is bound for the U.S. is not enough to apply a middleman's dumping margin to a producer. Rather, the producer must have knowledge that the product is likely to be dumped. *Tung Mung III*, 354 F.3d at 1377-78; *see also* Remand Results at 18 n.58 ("The issue [before the CIT] was whether or not to apply a single rate to the exporter when it had two different channels of distribution: (1) direct sales by [the producers of the subject merchandise], and (2) sales by [the producers] to a middleman . . . who resold that merchandise to United States customers. The Department applied a 'knowledge-based' standard, i.e., it considered whether the producer was aware or should have been aware that the middleman would be likely to dump subject merchandise into the United States. If the Department found such knowledge, it combined all sales, direct and through the middleman, to determine a single margin for the exporter. If the Department did not find such knowledge, it would calculate two rates for the exporter, one for the direct sales, and one for the sales through the middleman.").

appeared to be no first sale to a Chinese reseller before the crawfish tail meat was exported to the United States.

An examination of the transaction chain, however, convinced the Department that the claimed sales by Xiping (as exporter) to GBIE (as importer) were not legitimate because they were not commercially reasonable. This being the case, Commerce determined that the purported sales to GBIE should be ignored. Remand Results at 11-12.

After excluding the Xiping-to-GBIE sales, the Department then reviewed the transactions very much as it would in a traditional middleman dumping analysis, finding (1) sales directly from producer Xiping to Chinese Company A; and (2) sales by Chinese Company A, as the exporter, to the U.S. wholesalers as the first unrelated U.S. purchasers. *See id.* Thus, the Department found a sale by a home market producer to a home market reseller/exporter before the first sale to an unaffiliated U.S. purchaser. As it had in the Final Results, Commerce then used Chinese Company A's acquisition costs as normal value and its sales prices to U.S. wholesalers as the export price and determined that Chinese Company A's U.S. sales were at less than fair value. In addition, the Department used adverse facts available ("AFA")[11] to determine both export price and normal value. The Department then used the resulting margin to calculate an antidumping duty rate for Xiping's entries. Remand Results at 21.

---

[11]     If Commerce concludes that it should use "facts available" to calculate a dumping rate and it "finds that a respondent has 'failed to cooperate by not acting to the best of its ability to comply with a request for information,' the statute permits the agency to draw adverse inferences commonly known as 'adverse facts available' when selecting from among the available facts." *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1338 (Fed. Cir. 2016) (quoting 19 U.S.C. § 1677e(b) (2006)). This adverse inference, applied to the facts Commerce has available to it, often results in a higher dumping margin for an uncooperative interested party.

## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.   MIDDLEMAN DUMPING ANALYSIS

#### A.   Middleman Dumping Methodology

While the unfair trade statute does not specifically provide for a middleman dumping analysis, much less a specific methodology, case law and legislative history make it clear that Commerce has the authority to develop methodologies to examine transactions through middlemen to determine if they constitute sales at less than fair value. *See Tung Mung III*, 354 F.3d at 1374 (citing S. REP. NO. 96–249, at 94 (stating that the Department has the authority to address "sales from the foreign producer to middlemen and any sales between middlemen before sale to the first unrelated U.S. purchaser" so as to "avoid below cost sales by the middlemen")).

#### B.   The Department's Finding that the Sales from Xiping to GBIE were Not Commercially Reasonable is Supported by Substantial Evidence and in Accordance with Law

On remand, Commerce found that the series of transactions resulting in the ultimate sales to the U.S. wholesalers did "not . . . fit squarely into a traditional middleman dumping framework," which generally involves "a foreign producer selling to a middleman located in the producer's home market or in a third country" before the sale to the unaffiliated U.S. purchaser. Remand Results at 11 (citing *Tung Mung III*, 354 F.3d at 1374).

The added element in this case is Xiping's sale to GBIE, and GBIE's sale to Chinese

Company A. *Id.* Unlike the previous situations where the department has found middleman

dumping, Xiping claimed that it was an exporter that sold the crawfish tail meat to GBIE as the

U.S. importer. *See id.* According to Xiping, GBIE then sold the product to Chinese Company A,

which sold the crawfish tail meat to the U.S. wholesalers. *See id.* On remand, the Department

found that in order to analyze the transactions properly, and determine if they resulted in less

than fair value sales of Xiping's merchandise to U.S. purchasers, it had to adjust its middleman

dumping analysis. *See id.* Primarily, this adjustment was reflected in Commerce's determination

to ignore the sales from Xiping, as the exporter, to GBIE, as the U.S. importer, because they

were commercially unreasonable. *Id.*

Xiping argues that Commerce improperly excluded the sales from Xiping to GBIE. Pl.'s

Cmts. 7. For Xiping, the Department failed to explain how the transactions were "at all unusual

or uncommon in the context of trade between [the PRC] and the [United States] in general." Pl.'s

Cmts. 8.

Commerce may, in limited circumstances, exclude commercially unreasonable sales from

its dumping determinations. *See Catfish Farmers of Am. v. United States*, 33 CIT 1258, 1263,

641 F. Supp. 2d 1362, 1369 (2009) ("If the weight of the evidence indicates that a sale is not

typical of a company's normal business practices, the sale is not consistent with good business

practices, or the transaction has been so artificially structured as to be commercially

unreasonable, Commerce excludes the non-bona fide transaction from review."); *see also*

*Jinxiang Yuanxin Imp. & Exp. Co. v. United States*, 39 CIT __, __, 71 F. Supp. 3d 1338, 1345

(2015). In order to determine whether a sale is commercially reasonable, Commerce looks at the

transaction in light of the "totality of the circumstances." *Hebei New Donghua Amino Acid Co. v. United States*, 29 CIT 603, 610, 374 F. Supp. 2d 1333, 1339 (2005).

On remand, the Department examined the Xiping-to-GBIE sales and found that, remarkably, both Xiping's prices and sales quantity for its crawfish tail meat increased dramatically from the previous period of review.[12] Remand Results at 13-14. That is, were the Department to look only to the claimed sales from Xiping to GBIE, it would appear that Xiping was able to increase both its sales prices and the amount of product it sold into the United States. *Id.* at 14. This increase in volume was achieved even though Xiping Opeck's sales prices to GBIE "were substantially higher than the average prevailing U.S. market price at the wholesale level." *Id.* Put another way, if the sales to GBIE were legitimate, somehow Xiping had found a way to be paid more than the prevailing U.S. wholesale market price for its product, while at the same time selling more crawfish tail meat than it had previously. *See id.* Based on this evidence, Commerce concluded that Xiping's ability to increase sales quantity while simultaneously charging more than its competitors "defies normal commercial considerations." *Id.* at 15.

Commerce further found that the nature of the transactions and the relationships between Xiping and GBIE, and GBIE and Chinese Company A, did not conform to ordinary business principles reflecting arm's length transactions, because the record was devoid of any attempt by Xiping to find other U.S. customers after it established its relationship with GBIE. Remand

---

[12]       Specifically, Xiping's prices "increased by [[    ]] percent from the last [period of review] and increased by [[    ]] percent more than an increase in its competitors' prices; Xiping's sales quantity increased by [[    ]] percent from [the] last [period of review] and increased by [[    ]] percent more than an increase in its competitors' sales quantity." Transactions Mem. at 6.

Results at 16. In other words, once GBIE was incorporated it became the sole vehicle for Xiping's product, and only Xiping's product, to enter the United States. [13]

Moreover, the Department determined that GBIE's incorporation was suspect. Remand Results at 17. The Department supported this finding with record evidence that: GBIE incorporated in the State of Washington immediately prior to its first purchases from Xiping; GBIE's place of incorporation was the personal United States residence of Xiao Huan Xu; the registered phone number for the company was Xiao Huan Xu's mobile phone number; and although Xiao Huan Xu was GBIE's registered agent, GBIE's president was a Chinese national living in the PRC. *Id.*; Transactions Mem. at 13.

Commerce further found that Chinese Company A had a motive for having an entity in the United States act as an importer. If Commerce calculated export price as it normally would, based on the first sale to an unrelated U.S. purchaser, then export price would be determined based on the sale from Xiping to GBIE. *See* 19 U.S.C. § 1677a(a); Remand Results at 17-18. If this were the case, the inflated sales prices, present in those sales, would make it appear that the subject merchandise was sold at fair value into the United States. *See* Remand Results at 14-15. Thus, Chinese Company A's sales to the U.S. wholesalers at dumped prices would be hidden from view.

---

[13]     The record supports this finding. Specifically, the record shows that (1) Xiping sold [[     ]] percent of its crawfish tail meat to GBIE; (2) GBIE purchased [[     ]] percent of its crawfish tail meat from Xiping; (3) all crawfish tail meat purchased by GBIE is destined for the United States; (4) GBIE's [[     ]] business [[
]]; and (5) GBIE resold [[     ]] percent of the crawfish tail meat it purchased to Chinese Company A. Remand Results at 16.

Finally, absent from the record was any evidence of sales negotiating activities by GBIE in the United States.[14] *Id.* at 17. That is, there was no information on the record indicating that if, in fact, GBIE imported subject merchandise into the United States, it had attempted to sell the merchandise to U.S. customers rather than to Chinese Company A. *Id.* at 16.

It is apparent that the purported sales by Xiping to GBIE, and GBIE's claimed sales to Chinese Company A, were devised to conceal the true nature of the transactions. The unnecessary step of the sale to GBIE, which was no more than a single purpose shell corporation, was clearly conducted for the sole purpose of obscuring the sales to the U.S. wholesalers at less than fair value. This is demonstrated by the nature of the transactions among Xiping, GBIE, and Chinese Company A, as well as the circumstances surrounding GBIE's incorporation and sales activities. Therefore, the Department's conclusion that the sales from Xiping to GBIE were commercially unreasonable is supported by substantial evidence on the record and is in accordance with law.

**C.      The Department's Export Price and Normal Value Determinations and its Determination to Calculate a Single Dumping Margin are in Accordance with Law and Supported by Substantial Evidence**

In the Remand Results, the Department calculated a single dumping margin based on Chinese Company A's acquisition costs (as normal value) and sales prices to the U.S. wholesalers (as export price) and applied that margin to Xiping. The dumping margin was used to determine an antidumping duty rate for Xiping.

---

[14]      GBIE was only capitalized with [[          ]] and no fixed assets. Remand Results at 17; Transactions Mem. at 13. In addition, GBIE [[          ]] dealt in the crawfish tail meat business, and [[          ]] conducted business with Xiping and Chinese Company A. Remand Results at 17.

Once it found that the claimed sale from Xiping to GBIE should be ignored as not commercially reasonable, the Department viewed the actual transaction chain as a direct sale from Xiping to Chinese Company A. Commerce further found that, in accordance with its traditional middleman dumping methodology, it should calculate a dumping margin for Chinese Company A based on its acquisition costs and sales prices. For Commerce, once the Xiping-to-GBIE sales were excluded, the chain of transactions looked very much like a traditional middleman dumping scenario, *i.e.*, a sale by a foreign producer to a home market reseller prior to importation into the United States. Therefore, Commerce applied its normal methodology for determining export price. *See generally Tung Mung III*, 354 F.3d 1371.

Export price is "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States." 19 U.S.C. § 1677a(a). Here, to calculate export price, Commerce relied on the prices realized by Chinese Company A in its sales to the U.S. wholesalers. Thus, the Department employed its normal middleman dumping analysis to find the export price. Next, Commerce applied an adverse inference to the facts establishing the export price. Accordingly, it used the lowest price paid by the U.S. wholesalers as the export price. Remand Results at 39-40.

Plaintiff maintains that the Department (1) should have used the sales information from the Xiping-to-GBIE transaction to calculate a separate export price for Xiping for comparison to its normal value; and (2) should not have used the prices paid by the U.S. wholesalers to calculate the export price, because the price information for the U.S. wholesalers was unreliable. *See* Pl.'s Cmts. 13. For plaintiff, "even if the Department finds middleman dumping in the

underl[ying] review," a dumping margin that represents a margin determined for Xiping alone

would more accurately reflect that company's behavior. *See* Pl.'s Cmts. 20-21.

Commerce explained why it calculated export price as it did, including its reasons for not

determining an export price (and hence a dumping margin) for the Xiping-to-GBIE purported

sales or for the now constructed Xiping-to-Chinese Company A sales:

> [W]e now find that the facts in this case are akin to those in a traditional
> middleman dumping scenario in that we are left with two relevant sales, the
> Xiping-[Chinese Company A] (through GBIE) "sale" and the [Chinese Company
> A]-U.S. customer sale. Based on the channel of U.S. sales in this review, it is
> appropriate to calculate a single dumping rate for the entries under review.
> Because calculating a margin for a constructed Xiping Opeck-[Chinese Company
> A] (through GBIE) "sale" and incorporating it in our weighted-average rate for all
> of Xiping Opeck's merchandise would mean relying on information related to
> sales we have determined are not *bona fide* (Xiping Opeck's sales to GBIE), we
> have relied strictly on the margin determined for the [Chinese Company A]-U.S.
> customer sales to calculate the single rate in this case. . . . Thus, for U.S. price
> [i.e., export price] we relied on record evidence for the prices charged by [Chinese
> Company A] in the United States, *i.e.*, the U.S. wholesalers' aggregate price data,
> and calculated an estimated average U.S. wholesalers' market price of USD 10.14
> per kilogram for the period of review.

Remand Results at 40-41.

The court finds that the Department's determination not to calculate an export price for

the claimed Xiping-to-GBIE sales is reasonable, supported by substantial evidence, and in

accordance with law. Although Xiping believes otherwise, Commerce reasonably determined

that the Xiping-to-GBIE purported sales were commercially unreasonable. Because the sales

were not commercially reasonable, the claimed sales prices from Xiping-to-GBIE were not

reliable. Thus, there was no reliable sales information on the record from which to determine

accurate sales prices between Xiping and GBIE (or, for that matter, between Xiping and anyone

else). As such, the Department reasonably determined that it could not calculate an accurate

export price for Xiping based on these sales and, therefore, could not calculate a dumping margin based on the claimed Xiping-to-GBIE sales.

Normal value is the value of the merchandise in the foreign home market. *See* 19 U.S.C. § 1677b(a)(1)(B) (Normal value is "the price at which the foreign like product is first sold . . . for consumption in the exporting country"). To determine normal value, on remand, the Department relied on Chinese Company A's highest acquisition cost during the POR:

> [W]ith respect to normal value, we relied on [Chinese Company A's] acquisition costs because such costs represent GBIE's sales prices of Xiping Opeck's product to [Chinese Company A] throughout the POR. Specifically, as adverse facts available, we used [Chinese Company A's] highest acquisition cost during the POR, which we identified by examining all the prices that GBIE invoiced for crawfish tail meat to [Chinese Company A].

Remand Results at 20-21.

As to normal value, plaintiff seems to indicate that the Department should have used factors of production to construct Xiping's normal value and compared it to Xiping's sales price to GBIE (as export price) to produce a dumping margin. *See* Pl.'s Cmts. 13; *see also* Pl.'s Br. 1. Indeed, in nonmarket economy reviews, "Commerce determines normal value by using the 'best available information' from the surrogate country to value the factors of production." *DuPont Teijin Films v. United States*, 37 CIT __, __, 896 F. Supp. 2d 1302, 1310 (2013) (quoting 19 U.S.C. § 1677b(c)(1)). As has been seen, however, calculating a normal value for Xiping would have served no purpose because there was no reliable export price (using the purported Xiping-to-GBIE sales) to which to compare normal value.

As discussed above, Commerce's decision not to use the sales prices from Xiping-to-GBIE transactions to determine export price was reasonable. Because these transactions yielded no reliable sales from which an export price and, hence, a dumping margin could be determined, it would be a useless act to calculate normal value using Xiping's factors of production and

compare it to the Xiping-GBIE sales prices as export price. Therefore, the determination not to construct normal value from Xiping's factors of production is reasonable, too.

As with export price, the Department has used its traditional middleman dumping methodology to calculate normal value. Xiping has provided no convincing reason why the traditional methodology should not be employed. The use of the middleman's (here, Chinese Company A's) sales and acquisition prices to calculate export price and normal value has been approved by the courts, is supported by legislative history, and accords with the methodology set forth in Commerce's manual. *See Tung Mung III*, 354 F.3d at 1374; S. REP. NO. 96-249, at 94; ANTIDUMPING MANUAL, Ch. 7 at 5. Accordingly, the court finds that Commerce's decision to base Chinese Company A's export price solely on the prices paid by the U.S. wholesalers to Chinese Company A and its decision to base normal value on Chinese Company A's acquisition costs to be reasonable, supported by substantial evidence, and in accordance with law.

Next, Xiping seems to argue that its dumping margin should not be based solely on the dumping margin determined for Chinese Company A. Rather, Xiping believes it should have its own rate. Here, however, the facts provide no basis for giving Xiping its own rate. While in *Tung Mung*, the Federal Circuit affirmed Commerce's determination of two dumping margins, *i.e.*, one for the producer and one for the reseller, the facts in that case were different than the facts here. Unlike the case now before the court, in *Tung Mung III*, Commerce found that the producer could not be charged with knowledge that its reseller was selling its goods in the United States at less than fair value. This lack of knowledge of dumping provided a reason for a separate rate for the producer from the one calculated for the dumping reseller. *Tung Mung III*, 354 F.3d at 1377-78.

Here, the Department has demonstrated that Xiping knew its merchandise was to be sold into the United States by Chinese Company A and was also aware, or should have been aware, that its product was being dumped. First, Xiping knew its product was bound for the United States since it claimed to be exporting it to the United States through its sales to GBIE. Xiping also knew its claimed sales price to GBIE. Xiping further acknowledged that it had significant U.S. market share and that it effectively set the controlling sales prices in the U.S. market. Remand Results at 18 n.58. Based on this evidence, Commerce's conclusion that Xiping knew, or should have known, its goods were sold at less than fair value by Chinese Company A into the United States was supported by the record. *See* Transactions Mem. at 4 ("[B]ecause both Xiping Opeck and GBIE claimed to have knowledge of the prevailing prices for crawfish tail meat in the U.S. market during the POR, it is highly likely that Xiping Opeck and GBIE were aware that [Chinese Company A] was reselling the subject merchandise in the United States at prices that were substantially below its acquisition costs."). Because Xiping can be charged with knowledge that its product was being dumped, the facts do not direct the conclusion that it should have a dumping margin other than that calculated for Chinese Company A.

With respect to Xiping's argument that the determination of Chinese Company A's sales prices were somehow unreasonable, the court is not convinced. Because Chinese Company A did not answer Commerce's questionnaires, there was no evidence on the record of reported sales prices paid by the U.S. wholesalers. Therefore, Commerce constructed the prices at which Chinese Company A sold the crawfish tail meat into the United States using advertised retail offering prices of the U.S. wholesalers. Transactions Mem. at 8-9. Commerce relied on these prices to determine Chinese Company A's export price. Remand Results at 20. This was the same method proposed by the defendant-intervenor and used in the Final Results:

> [D]efendant-intervenor constructed an export price (U.S. sales price) based on the prices offered by the U.S. wholesalers of the crawfish tail meat to their retailers. Because defendant-intervenor was unable to determine [Chinese Company A's] resale prices of the crawfish tail meat to the U.S. wholesalers directly, it "relied on prices offered by four different U.S. wholesalers . . . of subject merchandise" that appeared to be "produced by Xiping[,] . . . as indirect evidence of the prices charged by" [Chinese Company A], to calculate a wholesale market price. That is, defendant-intervenor reasoned that the wholesalers would necessarily have paid [Chinese Company A] no more than the price at which they were offering to sell the merchandise to their retailers.

*Xiping Opeck I*, 38 CIT at __, 34 F. Supp. 3d at 1338 (footnotes and internal citations omitted).

While Xiping spends some pages in its brief attacking the use of these offered prices, it cites no record evidence indicating that the use of the prices was unreasonable. In fact, it cites no record evidence at all. *See* Pl.'s Cmts. 13 (referring to Pl.'s Br. 27-29). In addition, although Commerce's prices are from the same U.S. wholesalers that actually purchased Xiping's crawfish tail meat, there is no record evidence that Xiping's proposed price information sources[15] actually bought Xiping's product.[16] *See* Transactions Mem. at 10.

Finally, the Department pointed to some evidence on the record that the price information that Xiping presented was from sources for which crawfish tail meat would be at "premium

---

[15]     Xiping provided certain U.S. retail prices for crawfish tail meat imported from the PRC. Specifically, Xiping provided a purchase price paid by Walmart as well as pricing information taken from www.cajunsupermarket.com. *See* Transactions Mem. at 9-10.

[16]     In particular, Commerce found it convincing that "[defendant-intervenor] relied on prices offered by four different U.S. wholesalers or distributors of subject merchandise produced by Xiping Opeck as indirect evidence of the prices charged by [Chinese Company A] . . . [defendant-intervenor also] provided an affidavit from [the sales manager] of a competing U.S. wholesaler in support of [defendant-intervenor's] assertion that the four U.S. wholesalers did *not* handle product produced by Xiping Opeck's competitors," and therefore Commerce determined that "because all of these U.S. wholesalers or distributors were handling Xiping Opeck product and [[     ]] percent of Xiping Opeck's U.S. sales during the POR were made through the same . . . channel, all four entities were downstream purchasers from [Chinese Company A]." Transactions Mem. at 3 (emphasis added); *see* Remand Results at 20.

prices" and thus command a higher price. *See* Transactions Mem. at 9 ("According to [defendant-intervenor], . . . sales of crawfish tail meat in states that do not border Louisiana are not common and, thus, command premium prices as the product is considered a specialty item.").

Because the Department was reasonable in finding that the record was devoid of Chinese Company A's resale price, and that the most reliable facts available on the record were the U.S. wholesalers' offering prices, the calculation of export price from the U.S. wholesalers' offered prices was supported by substantial evidence on the record. Accordingly, the Department's determination to use Chinese Company A's sales prices to the U.S. wholesalers as export price and its acquisition costs from GBIE to establish normal value and to calculate a single dumping margin that was applied to Xiping is supported by substantial evidence and in accordance with law.

> **D.      The Department's Determination to Apply Adverse Facts Available to the Calculation of Chinese Company A's Export Price and Normal Value is Supported by Substantial Evidence and in Accordance with Law**

As has been discussed, Commerce, in accordance with its traditional middleman dumping methodology, used Chinese Company A's sales price to the U.S. wholesalers as the export price and its acquisition costs for normal value. In addition, Commerce determined to use "facts available" and apply "adverse inferences" to the facts used to determine export price and normal value.[17]

---

[17]       Commerce explained:

> [A]s export price, we selected the *lowest prices* charged by [Chinese Company A] in the United States (*i.e.*, the U.S. wholesalers' aggregate price data, as a proxy for [Chinese Company A's] U.S. sale prices) and calculated an estimated average

(footnote continued)

(1)      *Commerce Properly Found Chinese Company A to be an Interested Party*

Under normal circumstances, the Department may only use facts available or apply adverse inferences to those facts if an interested party has failed in its duty to produce information and cooperate with an investigation or review. Therefore, before applying adverse inferences to Chinese Company A's acquisition cost information or its sales prices to the U.S. wholesalers, the Department examined whether it was an interested party. *See* 19 U.S.C. §§ 1677e(a), (b). Among those interested parties listed in the statute is the "exporter . . . of subject merchandise." 19 U.S.C. § 1677(9)(A).

The Department found that Chinese Company A was an interested party even though the company insisted that it was a downstream purchaser unrelated to Xiping. Moreover, Chinese Company A maintained that it was not required to answer Commerce's questionnaires because it was not a party. Remand Results at 5 ("[Chinese Company A] did not provide any information regarding its U.S. sales or the pricing of entries under review. Instead, [Chinese Company A] filed a letter claiming that it had never exported subject merchandise to the United States, that it was not an exporter of subject merchandise, that the Department's questionnaire was not applicable to it, and that it was unable to respond to the questionnaire.").

The court has found reasonable Commerce's decision to ignore the purported sales from Xiping to GBIE because they were commercially unreasonable. The resulting transaction

---

U.S. wholesalers' market price for the POR of USD 10.14 per kilogram. For normal value, we examined all of the prices that GBIE invoiced for crawfish tail meat to [Chinese Company A], and used [Chinese Company A's] *highest acquisition cost* during the POR, *i.e.*, USD [[        ]] per kilogram. Using this information, we calculated an AFA rate of 70.12 percent for Xiping Opeck in this review.

Remand Results at 40 (emphasis added and footnotes omitted).

structure, therefore, was one of sales directly from Xiping (as producer) to Chinese Company A and from Chinese Company A (as exporter) to the U.S. wholesalers (as first unaffiliated purchasers in the United States). This restructuring of the transaction chain demonstrates that Chinese Company A was the exporter of Xiping's product, and as such, Commerce reasonably found Chinese Company A to be an interested party. *See* 19 U.S.C. § 1677(9)(A).

Commerce, however, has provided an additional reason. After evaluating Chinese Company A's role in the transaction chain, the Department found that the company was an exporter within the meaning of the statute because it was a "price discriminator" or a "party who, with its customer, determines the U.S. sales price ([export price or constructed export price]) of the subject merchandise entering the United States market." Remand Results at 22.

The idea of finding a price discriminator to be an interested party has been previously found in our law.[18] *See Taiwan Semiconductor Mfg. Co. v. United States*, 25 CIT 324, 331, 143 F. Supp. 2d 958, 966 (2001) ("Commerce's *Remand Response* defines 'relevant sale' as 'the first sale in the distribution chain by the company that is in a position to set the price of the product, and by doing so, to sell at less than fair value in or to the U.S. market.' Because such a company's 'pricing represents all relevant elements of value,' it 'functions as the "price setter" or potential "price discriminator . . . ."'" (citation omitted)). This is

> a reasonable construction of the statute because it furthers congressional intent for Commerce to determine whether subject merchandise is being, or is likely to be, sold in the United States at less than its fair value. In order to make a less-than-fair-value determination, Commerce must first determine the exporter or producer of the subject merchandise who controls the export price (or constructed export price) that Commerce compares to normal values to determine dumping margins.

---

[18]     Although the concept of "price discriminator" was used in *Taiwan Semiconductor* to identify the producer, the idea is equally applicable here. *Taiwan Semiconductor*, 25 CIT at 331, 143 F. Supp. 2d at 966.

*Id.* (citations omitted).

Since the true nature of the transaction was that Chinese Company A set the price (was the price discriminator) at which the merchandise was sold to the U.S. wholesalers, the Department's decision to treat Chinese Company A as an exporter is clearly reasonable. Chinese Company A's role as the seller who agreed on the sales price at which the crawfish tail meat was sold into the United States confirms its role as an exporter and price discriminator and provides further support for Commerce's determination to treat the company as an exporter and thus an interested party.

(2)     *Commerce Properly Used Facts Available and Applied Adverse Inferences to Those Facts*

Commerce solicits information from domestic and foreign companies to accurately assess if dumping has occurred and to determine a dumping margin. If, after Commerce requests information, any party "withholds information that has been requested by [Commerce]," "fails to provide such information by the deadlines . . . or in the form and manner requested," "significantly impedes a proceeding," or "provides such information but the information cannot be verified," the Department "shall . . . use the facts otherwise available" on the record to determine export price and normal value. 19 U.S.C. § 1677e(a)(2)(A)-(D); *see Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1337-38 (Fed. Cir. 2016).

In addition, an interested party must cooperate "to the best of its ability" with Commerce's requests for information. 19 U.S.C. § 1677e(b). If Commerce further finds that an interested party has "failed to cooperate by not acting to the best of its ability to comply with the

request for information," then it "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." *Id.* § 1677e(b)(1)(A).

Here, on remand, the Department found Chinese Company A was an interested party that both failed to provide information and failed to cooperate. It therefore used facts available to determine normal value and export price and applied adverse inferences in selecting those facts.[19] Remand Results at 40. Commerce acted lawfully here since, by not answering the questionnaire at all, Chinese Company A met the statutory tests for both the use of facts available and the application of adverse inferences. Therefore, Commerce properly applied adverse inferences in selecting the available facts used to calculate Chinese Company A's dumping margin.

(3)     *Commerce Properly Applied Chinese Company A's Margin to Xiping*

As has been discussed, Xiping can reasonably be charged with knowledge that its product was being dumped. Because Commerce properly applied its middleman dumping methodology when determining a rate for Chinese Company A, its determination to apply this rate to Xiping was made in conformance with law. *Tung Mung III*, 354 F.3d at 1374. Moreover, Xiping's participation in the claimed sale to GBIE, a sale with no reasonable commercial purpose, adds additional weight to the determination.

When complying with the court's remand instructions, though, the Department supplied additional reasons for applying Chinese Company A's dumping margin to Xiping, even though Xiping cooperated with the review. The court's remand opinion directed Commerce to address

---

[19]     Xiping does not assert that Chinese Company A cooperated with Commerce's investigation, but instead only argues that Chinese Company A was not required to cooperate because it was not an interested party. Pl.'s Cmts. 20.

the "inducement/evasion considerations" found in *Mueller Comercial de Mex., S. de R.L. de C.V. v. United States*, 753 F.3d 1227 (Fed. Cir. 2014). *Xiping Opeck I*, 38 CIT at __, 34 F. Supp. 3d at 1354 ("[I]n light of the Federal Circuit's decision in *Mueller*, the Department is to fully explain, what, if any, relevance *Mueller* has to the calculation of Xiping's dumping margin. That is, Commerce is to explain the relevance of *Mueller's* 'inducement/evasion considerations,' which might permit the application of AFA to a cooperating party in the context of the facts of this case."); *Mueller*, 753 F.3d at 1233 ("Commerce found that Mueller could and should have induced [its supplier's] cooperation by refusing to do business with [it], and [the supplier] would not be sufficiently deterred if Mueller were unaffected by [the supplier's] non-cooperation, stating that [the supplier] could otherwise evade its antidumping rate by funneling its goods through Mueller. We conclude that Commerce may rely on such policies as part of a margin determination for a cooperating party like Mueller . . . . ").

Discussing inducement and evasion, the Department concluded that, although the specific facts in *Mueller* and *KYD, Inc. v. United States*, 607 F.3d 760 (Fed. Cir. 2010) were distinguishable from the facts presented here, the cases were instructive and supported its determination to apply Chinese Company A's rate to Xiping. Remand Results at 45. Commerce found that "Xiping Opeck was in a position to induce cooperation on the part of" Chinese Company A because "[Chinese Company A] was not in a position to evade a dumping margin assigned to Xiping Opeck by sourcing from a different supplier." *Id*. This conclusion was drawn from the nature of their relationship and from Xiping's statement that it dominated and set

prevailing prices in the U.S. market.[20] *Id.* Accordingly, the Department found that "Xiping Opeck could have, by refusing to supply GBIE ([Chinese Company A's] . . . supplier), induced [Chinese Company A] to ensure it sold Xiping Opeck's product at or above its acquisition costs." *Id.* at 46.

The Federal Circuit has recognized that Commerce may rely on inducement and evasion policies "as part of a margin determination for a cooperating party . . . as long as the application of those policies is reasonable on the particular facts and the predominant interest in accuracy is properly taken into account." *Mueller*, 753 F.3d at 1233. Specifically, the Court has concluded that an exporter, possessing an existing relationship with its producer, may refuse to do business with that producer in the future "as a tactic to force [the supplier] to cooperate." *Id.* at 1235. The *Mueller* Court compared the relationship between Mueller and its producer to the importer-exporter relationship in its earlier inducement and evasion case, *KYD*, where the Court found that as a result of a pre-existing relationship, the importer could refuse to import the exporter's subject merchandise as a means to induce cooperation with Commerce's review. *See id.* (discussing *KYD*, 607 F.3d at 768).

As to evasion, in *Mueller*, the Federal Circuit noted that because "there [was] a possibility that [the supplier] could evade its own AFA rate by exporting its goods through Mueller if Mueller were assigned a favorable dumping rate," applying AFA to cooperating party Mueller based on the producer's non-compliance was in accordance with law. *Id.* That is, where there is a pre-existing relationship, application of an AFA rate to a cooperating party transacting

---

[20]        Specifically, the record reflects that Xiping sold [[     ]] of its crawfish tail meat to GBIE, and GBIE sold [[     ]] of its product to Chinese Company A. Remand Results at 45.

with a non-cooperating party prevents the non-cooperating party from evading a higher dumping

rate based on its own sales by engaging in sales with a cooperating party that is not dumping. *Id.*;

*KYD*, 607 F.3d at 768. In addition, the *KYD* Court stated that permitting a cooperative importer

to receive a different dumping rate from its uncooperative exporter "would allow [that]

uncooperative foreign exporter to avoid the adverse inferences permitted by statute simply by

selecting an unrelated importer, resulting in easy evasion of the means Congress intended for

Commerce to use to induce cooperation with its antidumping investigations." *KYD*, 607 F.3d at

768. Thus, the Federal Circuit has found that, under certain circumstances, the application of

AFA to a cooperating party is permitted.

The court finds that the Department adequately supported its determination with record

evidence and can rely on inducement and evasion considerations to apply an AFA-based margin

to cooperating party Xiping's crawfish tail meat entries. *See Mueller*, 753 F.3d at 1233. As to its

inducement considerations, the Department's finding that Xiping Opeck could induce Chinese

Company A's cooperation was supported by record evidence.[21] Next, Xiping acknowledged that

it dominated the U.S. market and effectively set the market prices of crawfish tail meat, leaving

Chinese Company A unable to purchase from another exporter at competitive prices. Remand

Results at 45. As a result of the exclusive relationship among the companies, and Xiping's

conceded dominance in the market, the Department's finding that Xiping could have refused to

supply Chinese Company A (through GBIE) and induced its cooperation is supported by

substantial evidence. Therefore, the court finds that it was reasonable on these particular facts to

---

[21]     Specifically, Xiping had an [[                              ]] with GBIE which had an
[[                         ]] with Chinese Company A. *See* Remand Results at 17, 45.

conclude that Xiping could have induced Chinese Company A to cooperate. *See Mueller*, 753 F.3d at 1233.

The court further finds that the evasion considerations discussed in *Mueller* equally apply here. In *Mueller*, Commerce was concerned that the non-cooperating party sought to evade its own dumping margin through sales to cooperating parties, whereas here, it appears that the cooperating party Xiping and Chinese Company A participated in sales with no commercial purpose other than for Xiping to evade the dumping margin that would result from Chinese Company A's dumped sales. *Cf. Mueller*, 753 F.3d at 1230. As the court has previously noted, it is difficult to see these transactions as anything other than an attempt to make it appear as though Xiping's merchandise entered the country based on invoices that did not accurately reflect the true relationship between normal value and export price. Thus, it is apparent that the transactions were tied together in an effort to evade an antidumping finding. While here the purpose of the transactions was to allow the producer Xiping to evade antidumping duties, the theory and, hence, the reason for citing the policy is the same. Therefore, the Department's use of its evasion policy found in *Mueller* as a further justification for the application of AFA to determine Xiping's margin is in accordance with law and supported by substantial evidence in this instance.

**CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that Commerce's Final Results as supplemented by the Remand Results are sustained. Judgement shall be entered accordingly.


                                            _____/s/ Richard K. Eaton_____
                                                 Richard K. Eaton, Judge


Dated:   April 5, 2017
         New York, New York